**John J. JANG, Plaintiff-Appellant,**

v.

**BILTMORE TIRE CO., INC., Defendant-Appellee.**

No. 85–2217.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1986.
Decided July 30, 1986.

William F. Lennon, Chicago, Ill., for plaintiff-appellant.

John H. Bickley, Jr., Bickley & Bickley, Chicago, Ill., for defendant-appellee.

Before WOOD and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff John Jang sued his former employer, defendant Biltmore Tire Co., Inc. ("Biltmore"), for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* More specifically, Jang alleged that Biltmore fired Jang in violation of the ADEA. At the close of the jury trial below, Judge Parsons granted a directed verdict for Biltmore on the ground that Jang failed to prove that the legitimate, nondiscriminatory reason for Jang's firing articulated by Biltmore was a pretext for age discrimination. Jang now argues that the district court erred by not letting the pretext issue go to the jury. We affirm.

I.

Before the trial, Jang and Biltmore stipulated that the only issue in this case was whether Biltmore discharged Jang in violation of the ADEA. The district court found the following facts relevant to Jang's claim.

Jang was born on March 15, 1931, in Korea. He immigrated to the United States in 1957 and became a naturalized citizen in 1982. Jang received a B.A. in liberal arts from Davis and Elkins College in West Virginia and has subsequently taken some undergraduate courses, including basic accounting, at Northwestern University.

In 1970, in response to a want ad, Jang began working as "top accountant" for Biltmore at a salary of $15,000 per year. While employed at Biltmore, Jang received yearly pay raises and in several years he received two raises. Biltmore usually gave all of its employees raises at Christmas time and adjusted employee salaries to compensate for inflation. Jang's raises were based upon the size of his salary and his position with Biltmore, not upon merit. Biltmore paid the tuition and costs for Jang to enroll in and attend the Advanced Management Institute at Lake Forest College, where Jang earned a Master of Sciences degree in management.

Biltmore retained the C.P.A. firm of Michael Silver and Company ("MS & C") as accountants and auditors. While Biltmore employed Jang, MS & C sent two auditors to Biltmore once a month to audit the books and records. The auditors would also pick up the necessary documents to prepare Biltmore's financial statements. MS & C would return the financial statements to Jang, who would attend a monthly meeting where the officers of Biltmore and representatives of MS & C would discuss the statements. The MS & C auditors also handled all of Biltmore's tax matters and managed Biltmore's profit-sharing trust. The cost to Biltmore for employing MS & C was substantial. Beginning in approximately 1974, MS & C began advis-

ing the president of Biltmore, Patrick Starr, that Jang lacked the ability to grow and continue to function in his job as Biltmore grew, and recommending Starr consider replacing Jang.[1] Apparently Starr did not inform Jang of those criticisms.

In February 1982 Jang underwent a brain operation. During Jang's absence, Starr requested that MS & C assign an auditor to Biltmore on a full-time basis. MS & C complied, assigning Gary Rosen to Biltmore during Jang's recuperation. Although Rosen was not a C.P.A. and lacked a master's degree in business or management, he was able to prepare the monthly financial statements and tax returns, implement new office procedures, render financial advice to Biltmore, and computerize Biltmore's accounts. Furthermore, the auditor's fees paid by Biltmore to MS & C were reduced as a result of Rosen's work.

Jang returned to work on July 13, 1982. Starr summoned Jang to his office and asked Jang whether he felt he could fulfill the physical and academic demands of his job.[2] Starr took no action at that time. However, on or about August 3, 1982, Starr again summoned Jang to his office. Starr told Jang he would be discharged on October 30, 1982. Starr told Jang that he could take the three months to pursue other employment and need not come to Biltmore during that time so long as he phoned in. Biltmore agreed to give Jang full pay during the three months and to reimburse him for fifty percent of the cost of hiring a job-search firm to locate a new job.

Starr subsequently spelled out Biltmore's reasons for terminating Jang. Starr stated that the company was growing and expanding and Jang was no longer capable of handling his job. Starr informed Jang that, based upon Jang's inability to prepare financial statements, read bank statements, and know or understand tax law, Biltmore had concluded that Jang was no longer qualified for his job. Starr also pointed out that a mistake by Jang in the payroll had cost Biltmore hundreds of dollars. Starr also informed Jang that he believed that Jang did not understand Biltmore's inventory procedures.

When Biltmore terminated Jang, it paid him five months severance pay (approximately $18,000), his profit-sharing portion (approximately $22,000), and one-half the cost of his search-firm fees ($2,000). Biltmore also gave him a three-year old automobile, owned by Biltmore, at cost (value approximately $2,800). Jang was approximately 51 when terminated. Biltmore replaced him with Rosen, the MS & C auditor, who was 29.

## II.

We have had numerous occasions recently to discuss the law in ADEA cases, so it is unnecessary to repeat our discussions in any great detail here. See, e.g., Christie v. Foremost Ins. Co., 785 F.2d 584 (7th Cir. 1986); LaMontagne v. American Convenience Products, Inc., 750 F.2d 1405 (7th Cir.1984). The district court found, over Biltmore's protestations, that Jang made out a prima facie case of age discrimination. The district court also found, however, that Biltmore met its burden of production by articulating a lawful, nondiscriminatory reason for Jang's discharge. At the close of the evidence, the court directed a verdict for Biltmore, concluding that "[a]fter careful examination of the evidence ... the plaintiff failed to meet his ultimate burden of proof in rebuttal to the defendant's articulated nondiscriminatory reasons for discharging him. The plaintiff did not show that the defendant's reasons were pretextual." The only issue we need

1. Biltmore, between 1970 and 1982, grew in sales volume from $5 million in sales a year to $40 million in sales a year. Biltmore created profit-sharing trusts and pension plans. Inventories increased dramatically, necessitating the implementation of various new accounting procedures. Biltmore's tax status became much more sophisticated and complicated, and Jang lacked the tax expertise necessary to handle the tax work.

2. Jang testified that Starr then asked Jang his age. Starr denied ever having asked Jang his age. For the purpose of this appeal, we assume that Jang's version is accurate.

decide is whether the district court erred in directing a verdict for Biltmore, or, more specifically, whether Jang presented substantial evidence from which a jury could have reasonably concluded that age was a determining factor in Biltmore's decision to terminate Jang. *See Christie,* 785 F.2d at 585.

To begin, we look at the evidence supporting Biltmore's articulated nondiscriminatory rationale for discharging Jang, keeping in mind that Biltmore bears only the burden of producing evidence, for the burden of proof remains upon Jang at all stages of the proceeding. *See LaMontagne,* 750 F.2d at 1409. Biltmore produced a substantial amount of evidence indicating that Jang lacked the necessary abilities to continue as Biltmore's comptroller in a situation where the company and the job description were changing. Biltmore clearly enunciated specific inadequacies on Jang's part that made him unsuitable for the job. Biltmore produced substantial evidence supporting the specific allegations.

Although we find it unnecessary to reevaluate all of Biltmore's evidence, we note that Biltmore produced several witnesses, over a period of four days, who testified to their personal knowledge of Jang's shortcomings as a comptroller and the effect these problems had on Biltmore. Furthermore, some of Biltmore's most convincing evidence was elicited from Jang himself on cross-examination. There can be no question that Biltmore thoroughly rebutted Jang's prima facie case, destroying any presumption of age discrimination. *See LaMontagne,* 750 F.2d at 1409.

After Biltmore rebutted Jang's prima facie case, the burden of production fell upon Jang to show that Biltmore's reasons were a pretext for age discrimination. *Id.* The district court directed a verdict for Biltmore upon finding that Jang offered no evidence from which a jury could have concluded that Biltmore discriminated against Jang on the basis of age. Jang's only argument on appeal is that the district court improperly granted Biltmore's motion for a directed verdict because Jang's evidence of pretext presented conflicting evidence and inferences which the jury should have been allowed to resolve.

To prevail, Jang must show that he presented substantial evidence from which a jury could have found pretext. *See LaMontagne,* 750 F.2d at 1414. Jang offers two theories why a jury could have found pretext. First, he argues that he presented substantial evidence of his own competence. Second, he argues the jury could have found Biltmore's articulated rationale unworthy of credence. Jang does not argue that he presented any direct proof of age discrimination.[3]

Once a defendant advances a specific legitimate rationale for the plaintiff's discharge, the plaintiff's rebuttal evidence must be specifically addressed to the defendant's articulated rationale. *See Christie,* 785 F.2d at 586. To the extent that Jang offered proof that his past work was acceptable, it was not responsive to Biltmore's rationale. Although Biltmore's evidence was necessarily, to some extent, based upon past job performance, Biltmore's rationale was that Jang was no longer competent to fill the role of comptroller as Biltmore continued to grow and progress into the future. This case is therefore not like *Christie,* where the plaintiff's evidence of past performance was responsive to the defendant's proffered reason for the discharge. None of the factors Jang cites in his brief as creating factual conflicts for the jury to resolve are responsive to Biltmore's proffered rationale and the specific inadequacies detailed by Biltmore's witnesses. Jang testified (he presented no other witnesses) that he had a good education and work background, that he had in the past instituted beneficial changes, that he had been an employee twelve years, that he had received top raises, and that he had received

---

**3.** The only age-related evidence suggested by Jang was his testimony that Starr asked him his age during the July 13, 1982 meeting. Even assuming Jang's account is accurate, this falls far short of constituting direct proof of age discrimination.

his master's degree. None of these facts rebut Biltmore's explanation that Jang lacked specific qualifications necessary to fulfill Biltmore's changing job description for a comptroller in the future. We note that at oral argument, even when repeatedly pressed by the panel, counsel for Jang did not indicate what specific evidence he had to rebut Biltmore's proffered rationale.

Jang is correct in asserting that, in some instances, a plaintiff can rebut the defendant's case merely by proving that the defendant's proffered reason is "unworthy of credence." *See Christie*, 785 F.2d at 586. That is not to say, however, that a plaintiff can avoid a directed verdict in any ADEA case by arguing the defendant's explanation is unworthy of credence. A plaintiff must do more than merely argue that the jury might have chosen to disbelieve all of the defendant's evidence. To avoid a directed verdict, a plaintiff must offer substantial evidence to support the argument. For example, in *Christie v. Foremost* the plaintiff showed that the defendant's managers had not known of or located the defendant's own reduction in force policy. *Id.* at 586–87. The plaintiff also showed that, had the defendant's managers followed the policy, the plaintiff would not have been fired. *Id.* Furthermore, in *Christie* the defendant's evidence in support of its rationale, although enough to satisfy its burden of production, was less than overwhelming. Because the plaintiff in *Christie* presented this substantial evidence to support his argument that the defendant's rationale was unworthy of credence, we affirmed the jury verdict for the plaintiff. *Id.* at 587.

We do not find similar evidentiary support for Jang's argument that Biltmore's rationale is unworthy of credence. Initially, we note that Biltmore presented overwhelming evidence to support its rationale. Jang's argument seems to be that he never had any indication from Starr that he was anything less than a good employee, and that if he were not working out surely Starr would have informed him of that or evidenced it in some sort of document. This is not, however, enough support to overcome a motion for a directed verdict. First, we reiterate that Biltmore's rationale was not that Jang had not been a good employee in the past, but rather that the changing business and changing job description had outgrown him. Even if the jury had completely accepted Jang's contention that he had been a good employee the past twelve years, it would not have rebutted Biltmore's rationale. Moreover, Biltmore's evidence showed that Starr was not really convinced that Jang needed to be replaced permanently until Jang was replaced temporarily by Rosen. During this time period, Starr saw clearly the difference in capabilities and costs to the company. Jang was terminated shortly after this time period. Finally, Jang conceded at trial that he was aware that the MS & C auditors criticized his work. Jang presented no substantial evidence to rebut Biltmore's evidence of his specific shortcomings. We find, therefore, that Jang produced insufficient evidence that Biltmore's rationale was unworthy of credence and thus the trial court did not err in directing a verdict for Biltmore.

AFFIRMED.