Robert J. KOVALIC, Plaintiff-Appellant-Cross Respondent.†

v.

DEC INTERNATIONAL, INC., a Wisconsin corporation, Defendant-Respondent-Cross Appellant.††

Court of Appeals

*No. 89-2011. Oral argument November 15, 1990.—Decided March 28, 1991.*

(Also reported in 469 N.W.2d 224.)

†Petition to review denied.

††Petition to cross-review denied.

865

For the plaintiff-appellant-cross respondent the cause was orally argued by *Fred Gants* and submitted on the briefs of *Fred Gants, Margaret Baumgartner* and *Monica Burkert-Brist* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.* of Madison.

For the defendant-respondent-cross appellant the cause was orally argued and submitted on the briefs of *Michael H. Auen* of *Foley & Lardner* of Madison.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J.

## I. INTRODUCTION

This is an age discrimination action commenced under the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, *et seq.* Robert Kovalic, a former employee of DEC International, Inc., obtained a jury verdict finding that DEC willfully terminated his employment because of his age and assessing damages for both past and future wage loss.

DEC moved for judgment notwithstanding the verdict on the discrimination issue and, alternatively, to change the jury's answer to the discrimination question[1] from "yes" to "no." The motions were grounded on DEC's argument that, to prevail in a discrimination case, the plaintiff must do more than simply prove a *prima facie* case and then show that the reasons advanced by the employer for the discharge were pretex-

---

[1]Question No. 1 of the special verdict, which was answered in the affirmative, asked: "Was the plaintiff's age a determining factor in the defendant's decision to terminate him?"

tual—that there must be proof that the employer's pretext was a pretext for age discrimination.[2] The trial court denied the motions.

DEC also moved for a directed verdict on the issue of "willfulness"—whether DEC's decision to terminate Kovalic's employment because of his age was willful.[3] The court granted that motion.

The trial court also granted DEC's alternative motion for a new trial on grounds that "the verdict is contrary to the great weight of evidence and a new trial in the interest of justice is warranted."

We granted Kovalic leave to appeal the "willful" ruling and the order for a new trial. DEC cross-appealed from a pretrial order denying its motion to dismiss the action as untimely filed, and from the order denying its motions to change answers and for judgment notwithstanding the verdict on the discrimination question.

## II. ISSUES AND DECISION

The parties raise several issues. However, we consider two to be dispositive: (1) whether Kovalic's action

[2] As will be discussed at some length below, Kovalic sought to establish discrimination by indirect proof. It is a burden-shifting procedure. Once the plaintiff establishes a *prima facie* case (membership in the protected age class and that he or she was performing in a reasonably satisfactory manner) and the employer articulates legitimate, non-discriminatory reasons for the discharge, the plaintiff may then attempt to establish discrimination by either showing that the discharge was in fact the result of a discriminatory reason or, alternatively, may show that the proffered reasons were "pretextual." *See* our discussion *infra* of *Texas Dep't of Community Affairs v. Burdine* and related cases.

[3] Under the ADEA, a finding of willfulness doubles any award of backpay. *Kossman v. Calumet County,* 849 F.2d 1027, 1028–29 (7th Cir. 1988).

is time-barred; and (2) whether the trial court erred in ruling that a plaintiff may prove age discrimination indirectly by simply establishing that the employer's proffered reasons for discharge were pretextual, without more.

We hold that the action was not untimely filed. We also conclude, however, that the trial court erred as a matter of law when it denied DEC's motion for judgment notwithstanding the verdict, for there is no evidence from which the jury could determine or infer that any pretext that may have been present in DEC's stated reasons for firing Kovalic was a pretext for prohibited discriminatory action.

Because we so hold, it becomes unnecessary to consider various other arguments made by the parties. We therefore reverse and remand with directions to the trial court to enter judgment dismissing Kovalic's complaint.

## III.   SUMMARY OF FACTS

Kovalic, who was fifty-four years old when his employment with DEC was terminated in March, 1986, had worked for the company for approximately seven years as the general manager of its British subsidiary, Fabdec, Ltd. From 1979, when Kovalic joined the company, through 1983, Fabdec manufactured farm milk tanks at its plant outside London. England was the principal market for the tanks.

In 1984, the European Economic Community imposed milk quotas on its member nations and, for reasons not necessary to our discussion, this action effectively eliminated the English market for Fabdec's milk tanks. At about the same time, another DEC subsidiary, a Danish company known as DEC A/S, was experiencing losses. DEC A/S also manufactured milk

tanks, although of a different design than those manu-factured by Fabdec. In order to keep DEC A/S afloat, and in hopes of reversing Fabdec's own downturn in the wake of the common market quotas, DEC decided to transfer DEC A/S's inventory and all of its production activities to Fabdec. Thus, beginning in 1985, Fabdec undertook the manufacture of new products for sale on the European continent.

Also in 1985, Fabdec built a large 12,000 liter "DX" tank for Westfalia, a German company and one of Fabdec's major customers. Westfalia also asked Fabdec to build a line of similar, but smaller, "DWX" tanks, indicating its interest in purchasing 200–300 such tanks per year. Fabdec undertook the manufacture of a number of prototype DWX tanks, but both they and the large DX tank delivered to Westfalia were of poor quality and were rejected, resulting in the loss of the DX sale and of Westfalia's future purchases of DWX tanks.

These and other problems continued to plague Fabdec in succeeding months and, on March 17, 1986, Kovalic was informed by an officer of DEC that his employment was being terminated.

After initially consulting with English attorneys, Kovalic brought this action against DEC claiming, among other things,[4] that the company had fired him because of his age in violation of the ADEA. Other facts will be referred to in the body of this opinion.

## IV.   THE STATUTE OF LIMITATIONS

Commencement of an age discrimination action under the ADEA is conditioned upon the plaintiff's first

---

[4]Other claims and causes of action were either abandoned or dismissed, and the case went to trial and verdict solely on the ADEA claim.

filing a complaint with the state Equal Employment Opportunities Commission. The act sets minimum and maximum time limitations within which the state filing must occur.

> No civil action may be commenced . . . under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such charge shall be filed—
> (1) within 180 days after the alleged unlawful practice occurred; or
> (2) in a case to which section 633(b) of this title applies, within 300 days after the alleged unlawful practice occurred . . .. 29 U.S.C. § 626(d).

In this case, Kovalic filed a complaint with the Wisconsin EEOC on January 9, 1987, some 298 days after his discharge. Thus, unless his case is one coming under § 633(b) of the act, it is untimely. Section 633(b) applies to cases involving unlawful practices "*occurring in a State* which has a law prohibiting discrimination in employment." (Emphasis added.)

DEC cites *Pfeiffer v. Wm. Wrigley Jr. Co.*, 755 F.2d 554 (7th Cir. 1985), and *Cleary v. United States Lines, Inc.*, 728 F.2d 607 (3rd Cir. 1984), for the proposition that the location of the employee's residence and workplace controls the location of the discrimination, and thus the applicability of the ADEA. Because Kovalic lived and worked in England, and was terminated from a position in an English company, DEC maintains that the alleged discriminatory acts could not have "occurr[ed] in a State," within the meaning of the act. Thus, according to DEC, the 180-day limitation controls and Kovalic's claim, which was not filed within that time, must fail. We disagree.

870

Although both *Pfeiffer* and *Cleary* involved employees of American companies working abroad, and both recognized that the employee's "work station" determined whether the ADEA applied, neither case considered the "occurring in a State" language argued here. Indeed, both cases involved a blanket prohibition against any extraterritorial applicability of the act—a prohibition that no longer exists.

Prior to 1984, § 626(b) of the ADEA incorporated language of the Fair Labor Standards Act, 29 U.S.C. § 213(f), which states that its provisions are inapplicable "to any employee whose services during the workweek are performed in a workplace within a foreign country . . .."[5] Thus, the issue in *Pfeiffer, Cleary,* and similar cases was not whether the "occurring in a State" language of § 633(b) barred coverage for workers in foreign countries, but whether under § 213(f) the individual workers in the cases "performed [services] in a workplace within a foreign country."

We believe another case, *Heiar v. Crawford County, Wis.,* 746 F.2d 1190 (7th Cir. 1984), *cert. denied,* 472 U.S. 1027 (1985), is more instructive on the interpretation of § 626(d). In *Heiar,* three deputy sheriffs commenced an ADEA action challenging a mandatory retirement ordinance in force in the county in which they were employed. While all plaintiffs filed within 300 days of reaching the mandatory retirement age, two of them missed the 180-day deadline. Thus, if Wisconsin, the site

---

[5]The extraterritorial restriction was deleted from the ADEA in 1984, and, with one exception not applicable here, its provisions were specifically extended to United States citizens employed abroad by American corporations or their subsidiaries. Older Americans Act Amendments of 1984, Pub. L. No. 98–459, § 802, 98 Stat. 1767, 1792 (1984) (codified as amended at 29 U.S.C., §§ 623(f)(1) and (h), 630(f)).

where the alleged unlawful acts occurred, was a "deferral state"—that is, under the act, one with an age discrimination law and enforcing agency—the 300-day limit would apply. In Wisconsin, however, state law provided that the age discrimination laws did not apply to "hazardous occupations, including . . . law enforcement . . .." Sec. 111.32(5)(e), Stats. (1979–80). The employer argued that because the protections of the age discrimination laws were not available to the plaintiffs, Wisconsin could not be a "deferral" state within the meaning of § 626(d) of the act, and the 180-day limitation barred the deputies' action.

The Seventh Circuit disagreed, noting that the purpose of the state EEOC filing requirement was to give states with age discrimination laws the chance to respond to complaints and "to eliminate age discrimination without federal judicial intervention." *Heiar,* 746 F.2d at 1195. Despite the fact that it was "pretty clear that the state agency cannot help the claimant," the *Heiar* court ruled that the 300-day limitation applied. *Id.* The court concluded that "it should be enough that there is a law at least potentially applicable to the employer . . . and an agency charged with enforcing it." *Id.* (citations omitted). Thus, even though state law specifically denied law enforcement personnel the right to bring EEOC proceedings for age discrimination, the court—noting at least the "potential[ ]" applicability of the law[6]—applied the 300-day limitation to the plaintiffs. *Id.*

In this case, we see the potential applicability of Wisconsin's age discrimination laws to Kovalic as far greater than it was for the plaintiffs in *Heiar.* Kovalic

---

[6]The court felt that the statutes were "not entirely free from ambiguity," and thus at least some potential existed for their applicability to the plaintiffs' claims. *Heiar,* 746 F.2d at 1195.

was employed by DEC, a Wisconsin company, to manage one of its subsidiaries. He was hired and trained by DEC, reported to DEC, was paid by DEC and, ultimately, was fired by DEC (the decision was made by the company's board of directors meeting in Madison).

On this record, we conclude that the 300-day limitation applies and that the trial court properly denied DEC's motion to dismiss on timeliness grounds.

## V.   DISCRIMINATION

We next consider DEC's arguments that the trial court erred in denying its motion for judgment notwithstanding the jury's answer to the "discrimination" question. Such a motion concedes the propriety of the verdict, but argues that the moving party should nonetheless have judgment "for reasons evident in the record which bear upon matters not included in the verdict." *See* Judicial Council Committee's Note, 1974, Wis. Stat. Ann. sec. 805.14 (West 1977); Graczyk, *The New Wisconsin Rules of Civil Procedure—Chapters 805-807,* 59 Marq. L. Rev. 671, 706 (1976). We believe such reasons are present here.[7]

---

[7]As indicated, DEC also moved to change the jury's answer to the discrimination from "yes" to "no." Such a motion challenges the sufficiency of the evidence to sustain the answer, sec. 805.14(5)(c), Stats., and it must be considered in the context of the instructions given to the jury.

Here, the jury was instructed, in essence, that it could find for Kovalic upon proof "that the reason given by [DEC] was not the true reason for [Kovalic's] discharge, *or* that [Kovalic's] age . . . was a determining factor in his discharge." (Emphasis added.) However, DEC, although it had propounded an instruction stating the law correctly—that pretext *and* some discriminatory motive must be present—failed to object to the court's

873

## A. Proving Discrimination

In age discrimination cases, the plaintiff must establish that age was a determining factor in the decision to discharge. *Brown v. M & M/Mars,* 883 F.2d 505, 507 (7th Cir. 1989). The plaintiff need not prove that age discrimination was the *only* factor motivating the discharge; only that, among others, it was a determining factor. *La Montagne v. American Convenience Prods., Inc.,* 750 F.2d 1405, 1414 (7th Cir. 1984).

Courts have long allowed proof of discrimination by circumstantial evidence. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n.3 (1983). Because of the generally-recognized difficulties of proof in such cases—proof of an employer's motivation—the circumstantial or "indirect" method of proof allows a plaintiff to prove his or her case "by eliminating all lawful motivations, instead of proving directly an unlawful motivation." *La Montagne,* 750 F.2d at 1410 (footnote omitted). Kovalic's case was circumstantial; he attempted to establish DEC's liability indirectly.

The first requirement faced by such a plaintiff is that he or she establish a *prima facie* case. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54

acceptance of Kovalic's instruction and rejection of its own at conference. Indeed, the court indicated counsel's agreement to the instructions on the subject offered by Kovalic.

Failure to object to an instruction at the instruction conference waives the objection, sec. 805.13(3), Stats., and aside from our discretionary power to order a new trial under sec. 752.35, Stats., we lack authority to review the claimed error. *State v. Schumacher,* 144 Wis. 2d 388, 408–09, 424 N.W.2d 672, 680 (1988).

(1981). A plaintiff may do this by showing he or she: (1) was a member of the protected class, i.e., a person over the age of forty; (2) was performing well enough in the job to meet the employer's legitimate expectations; and (3) was discharged and replaced. *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 17 n.5 (7th Cir. 1987), *overruled on other grounds, Coston v. Plitt Theatres, Inc.,* 860 F.2d 834, 836 (7th Cir. 1988).

Once the plaintiff proves a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason (or reasons) for the discharge—to "produce[ ] 'admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" *Graefenhain,* 827 F.2d at 18 (citing *Burdine,* 450 U.S. at 255). When the employer presents such evidence, the presumption raised by the plaintiff's *prima facie* case falls away and he or she must then proceed to establish that the reasons offered by the employer "were not its true reasons, but were merely a pretext for discrimination." *Graefenhain,* 827 F.2d at 18 (citing *Burdine,* 450 U.S. at 255 & 257 n.10).[8]

At this stage, the employee, who still carries the ultimate burden of proving discrimination, may proceed in two ways: (1) directly, by persuading the court that a discriminatory reason more likely motivated the

---

[8]A reason need not be false in order to be pretextual. The facts asserted by the employer may be true but not be the actual reason for the employer's action. *Puetz Motor Sales, Inc. v. LIRC,* 126 Wis. 2d 168, 175, 376 N.W.2d 372, 376 (Ct. App. 1985). In addition, a plaintiff may show pretext in several ways, such as establishing that the proffered reasons have no basis in fact, or did not actually motivate discharge, or that they were insufficient to motivate discharge. *La Montagne,* 750 F.2d at 1414–15.

employer's decision; or (2) indirectly, "by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256 (citation omitted).

Thus, the indirect method of proof allows a plaintiff to prevail without presenting any direct evidence that age was a determining factor in the employer's motivation to discharge the employee.

## B. "Causal Pretext"

DEC contends, however, that a plaintiff cannot prevail in a discrimination action by simply proving that the employer's proffered reasons for the discharge were pretextual. The company maintains that the plaintiff must also establish a "causal" relationship between the showing of pretext and age discrimination—that the plaintiff's burden is to "establish that the employer's reasons are a pretext *for discrimination.*" (Emphasis DEC's.)

Kovalic disagrees, relying principally on a statement in *Graefenhain* that the indirect method of proof "allows victims of age discrimination to prevail without presenting *any* evidence [of discrimination]." 827 F.2d at 18 (quoting *La Montagne,* 750 F.2d at 1409–10) (emphasis in *La Montagne).* We do not read either the statement or the context in which it was made to permit a plaintiff to prevail without any evidence to establish—or even to infer—that the pretext was a pretext for discrimination.

First, it is true, as the above quote from *Graefenhain* suggests, that a plaintiff may, through indirect proof, establish liability without presenting any evidence of actual discrimination. But the *Graefenhain* court was careful to point out that, in cases where a plaintiff establishes pretext and the employer's decision remains unexplained, "the inferences from the evidence

produced by the plaintiff *may* be sufficient to prove the ultimate fact of discriminatory intent." 827 F.2d at 18 (emphasis added; citations omitted). Indeed, in the paragraph immediately preceding the one in which the quote selected by Kovalic appears, the *Graefenhain* court cited *Burdine* for the proposition that, once his or her *prima facie* case "falls away" upon the employer's offer of a non-discriminatory reason for the discharge, the plaintiff "must then prove . . . that the reasons . . . were not [the employer's] true reasons but were merely a *pretext for discrimination." Graefenhain,* 827 F.2d at 18 (emphasis added).

Second, a later Seventh Circuit case, *Brown v. M& M/Mars,* expressly imposed the requirement that, to prevail upon a showing of pretext alone, a plaintiff must establish that the pretext existed to mask the employer's discriminatory motive. 883 F.2d at 510–11. *Brown* followed *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 559 (7th Cir.), *cert. denied,* 484 U.S. 977 (1987), a race discrimination case in which the court, pointing to two earlier decisions[9] it described as "stressing that the plaintiff must show not only a false reason but also a causal chain in which race or another forbidden criterion plays a dispositive role," stated that the "pretext" that will support a finding in the plaintiff's favor is not simply a "poorly founded" reason, or even an attempt to "hide some other offense, such as a violation of a civil service [requirement] or a collective bargaining agreement," but must be a "pretext for discrimination." In *Brown,* an age discrimination case under the ADEA, the court followed and applied *Pollard:* "[A]s we noted in *Pollard,* '[s]howing that the employer dissembled is not

---

[9]*Maguire v. Marquette Univ.,* 814 F.2d 1213, 1216–18 (7th Cir. 1987), and *Sherkow v. Wisconsin,* 630 F.2d 498, 502 (7th Cir. 1980).

necessarily the same as showing "pretext for *discrimination*." ' " *Brown,* 883 F.2d at 510 (emphasis in *Pollard*).

Thus, DEC is correct in its assertion that the trial court erred when it ruled that the law did not require any causal link between the employer's pretext and a discriminatory motive. But that does not end our inquiry. Our holding that there must be some evidence that the pretext was a pretext for discrimination invites the further question: whether there is "enough evidence in this case to supply the necessary inference of discrimination." *Brown,* 883 F.2d at 511. And in considering that question we are guided by the rule that a jury's answer to a special verdict question will not be changed if, viewing the evidence in the light most favorable to the verdict, it is supported by any credible evidence. *Nelson v. Travelers Ins. Co.,* 80 Wis. 2d 272, 282–83, 259 N.W.2d 48, 52–53 (1977).

Here, the trial court found that the reasons put forth by DEC for the discharge fit into two categories: (1) that Kovalic's job was being eliminated as, among other things, a cost saving; and (2) that DEC had lost confidence in Kovalic's ability to manage Fabdec in the future, due to (a) rejection of the DWX prototype and the loss of Westfalia's future orders, (b) the continued existence of accounting problems at Fabdec's German subsidiary, Elektrogeno Gmbh, and (c) dissatisfaction with Kovalic's business projections and his knowledge of sales data. We will consider the evidence on each point *seriatim.*

When Kovalic was discharged, Delbert Lins, DEC's executive vice-president, temporarily assumed his duties. Eventually Brian Colley, Fabdec's company secretary, took over the company's management, while continuing to serve as corporate secretary. Colley, who had initially

been hired as secretary by Kovalic, was approximately thirty-seven years old at the time. Kovalic conceded that he could not have performed the corporate secretary's duties without additional training. During the course of his testimony, Kovalic acknowledged his earlier deposition in which he indicated that he could not have assumed the secretary's job because he was not an accountant and was unfamiliar with the legal, tax and other matters within the secretary's responsibilities.

Kovalic also testified that when Lins told him he was being discharged, one of the reasons put forth was that it was being done as a "cost reduction"—that he eventually would be replaced by a British employee (a "local") at a lower rate of pay. Kovalic acknowledged that "local[s]" are paid less than Americans in England, and that is borne out by the fact that, while Kovalic was being paid $78,000 per year, his replacement, Colley—an Englishman—was paid only $24,000, even though he was discharging additional responsibilities as company secretary.

Kovalic points to evidence from which it could be found or inferred that his job was not "eliminated" but simply assumed by Colley in addition to his other duties. DEC does not dispute this, and we do not see that evidence, or any of the other evidence on the point as allowing a jury to conclude or infer that this proffered reason was a pretext for age discrimination.

As to DEC's loss of confidence in Kovalic's ability to manage the company in the future, the first factor mentioned was the failure of the DX and DWX tanks and the resulting loss of Westfalia's future orders. While, as we indicated earlier, Westfalia was one of Fabdec's major customers, the business loss here under consideration was not a loss of any of Fabdec's existing business,

but only its future business, with specific reference to the DWX tank orders.

According to DEC officials, the DWX tank and the business it represented—as indicated, Westfalia was planning to purchase 200–300 tanks a year—were "extremely important" to the company. Lins testified that Kovalic himself estimated a sales loss of £700,000 from that project for 1986, the year following Westfalia's rejection of the tanks. The problems with both tanks—the DX and DWX—included delays and quality deficiencies.

DEC held Kovalic responsible for these problems. And while Kovalic stated that many of the problems he experienced with the tanks could be linked to parts that had been manufactured by DEC A/S, this was disputed by DEC. According to Lins, when Kovalic undertook to correct the problems with the first DWX tank and design a second prototype, he was free to obtain components for it on his own. Lins also testified that, while some of the production delays may have originated in Denmark, not all of them did.

Kovalic's position is that because Westfalia's complaints centered on the design and manufacture of components that came from DEC A/S in Denmark, and because he testified that he kept management "informed of these matters as they developed . . . the jury could have concluded that DEC management knew exactly the source of the problems for which it later attempted to blame [him]." But "[t]he issue in [an] ADEA action . . . is not whether [the employer] made a wise decision in determining that its problems . . . reflected adversely upon [the discharged employee]. The issue is whether [the employer] fired [the employee] because of his age." *Menard v. First Sec. Servs. Corp.*, 848 F.2d 281, 287 (1st Cir. 1988). "[E]ven assuming it could be shown that [the

employer] was wrong to blame [the employee], this would be insufficient to prove pretext or discriminatory intent." *Id.*

We conclude here as well that the evidence relating to the problems with the milk tanks and the loss of Westfalia's DWX orders is insufficient even to raise an inference that this reason for Kovalic's termination was a pretext for discriminating against him because of his age.

The next reason offered by DEC for the discharge was the company's loss of confidence in his management ability resulting from accounting problems and a "lack of accounting control" at Elektrogeno. Kovalic acknowledged that he had "oversight" responsibility for Elektrogeno's operations.

Elektrogeno apparently was working with its own accounting system, and several problems with that system arose and continued for some time, resulting in, among other things, a lack of data to report to DEC. DEC president Henrik Moe testified that Elektrogeno was using an inappropriate system that made DEC's profit figures erratic—made the figures "jump[   ] up and down." Moe stated that they figured out the problems in mid to late 1985, and that because Elektrogeno reported to Kovalic, he insisted that Kovalic solve them. Kovalic apparently hired an outside firm to look into the matter and eventually learned that the main problem was that no one at Elektrogeno was trained to do the accounting work.

The evidence on the accounting problems and Kovalic's response is not conclusive, but it needn't be. It is undisputed that problems existed at Elektrogeno, that they were "manageable," and that Elektrogeno reported to Kovalic. It is also undisputed that, while Kovalic described his responsibility for Elektrogeno's affairs as

one of "oversight," his superiors held him responsible for those problems and their solution, and that they were dissatisfied with his role in this regard. Again, even if Kovalic was not entirely blameworthy with respect to these problems, that is not evidence of discriminatory pretext. *Menard*, 848 F.2d at 287. We see no evidence here to support a conclusion—or even an inference—that DEC's dissatisfaction with Kovalic's handling of Elektrogeno's accounting problems was a pretext for discriminating against him by reason of his age when he was fired.

We reach a similar result with respect to DEC's dissatisfaction with Kovalic's plans and income projections for Fabdec. Kovalic stated that although he was aware of Lins' lack of confidence in his projections, he never saw "any opposition to [them]." In September, 1985, after the loss of the anticipated Westfalia orders, Kovalic projected that Fabdec would lose £300,000, and Elektrogeno £50,000, in the following year. Several weeks later when DEC, continuing to face serious financial problems, was attempting to project its 1986 income, Kovalic's plan reflected a loss of £200,000. According to Moe, that posed serious concerns for DEC management, for if Kovalic's projections were to be implemented, they were "looking at closing down Fabdec." Working with Kovalic, Moe and Lins came up with a revised plan for 1986 operations which they projected would trim the losses to approximately £85,000. The projection was conditioned on Fabdec implementing a twenty percent reduction in overhead costs, while increasing its sales and decreasing its expenses.

DEC officers met with Kovalic again in February, 1986, and he was still showing substantial European sales of DX tanks in his projections even though, as Moe noted, "we hadn't even built an acceptable tank yet."

Lins was "highly skeptical" of those projections, for, according to him, the DWX tank was still in pieces on the floor, and not only had they yet to produce one, but the competition for such tanks in Europe was "very tough." In addition, Lins testified that the plan developed earlier for overhead and expense cuts and sales increases had not been implemented. He stated that while there had been some price changes and "some slight increases" in sales of some products, they were "not of the magnitude that we had projected," and there was no evidence that Kovalic had implemented any overhead reductions. Kovalic acknowledged that he could not remember whether he ever made any reductions in overhead.

Kovalic counters by characterizing DEC's evidence as "implausible." He bases the assertion on evidence that, after he had left the company—and Lins, and eventually Colley, took over—it began to "return[  ] to profitability." He does not indicate, however, how this evidence establishes that DEC's announced dissatisfaction with the manner in which he developed and implemented business plans and projections prior to his discharge was a mask for discrimination. It is true that a plaintiff can, in some instances, rebut the defendant's case merely by proving that the proffered reasons are "unworthy of belief."

> That is not to say, however, that a plaintiff can avoid a directed verdict in any ADEA case by arguing the defendant's explanation is unworthy of credence. A plaintiff must do more than merely argue that the jury might have chosen to disbelieve . . . the defendant's evidence. To avoid a directed verdict, a plaintiff must offer substantial evidence to support the argument. *Jang v. Biltmore Tire Co.*, 797 F.2d 486, 490 (7th Cir. 1986).

The final reason mentioned—dissatisfaction with Kovalic's knowledge of sales data—is much more tenuous. Kovalic testified that he understood from listening to various depositions of DEC officers during the pendency of the lawsuit that DEC was dissatisfied with his knowledge of sales and orders "on a daily basis." While DEC officials reported some dissatisfaction with Kovalic's ability to provide them with up-to-date sales reports on one occasion, this appears to be an insignificant and perhaps inadequate reason—at least by itself—for the discharge. But, as with the other reasons, we have examined the trial transcript in detail and see nothing to indicate that offering this dissatisfaction as a reason for termination was a pretext for age discrimination.

In *Brown v. M&M/Mars,* the court, describing it as "a close case," found adequate evidence to "supply the necessary inference of discrimination" where the record established that the fired employee (who was the oldest foreman at the plant at which he worked) outperformed all younger foremen in at least four separate and distinct areas—each of which had been cited by the employer as an area in which his deficient performance led to his discharge. 883 F.2d at 511.[10] There is no evidence of

---

[10]The *Brown* court's feeling that the case was "close"—that is, that "credibility was a key issue"—was a significant factor in leading the court to uphold the jury's verdict. 883 F.2d at 511–12. The court took pains to note, for example, that cases where credibility of witnesses is crucial are best left to the fact finders, rather than "appellate panels [which] have [had] no opportunity to observe witness demeanor . . .." *Id.* at 511–12.

In this case, as our discussion of the evidence indicates, credibility is not the key to the case. We agree with the trial court—who, we note, also had the benefit of hearing and observing all the witnesses—that "[t]his is not a case where there were

similar import in this case. The only fact even remotely related to age discrimination is that Colley, who folded Kovalic's responsibilities into his own after Kovalic's departure, was several years younger. However, "the difference in age . . . in and of itself, fails to raise an inference of age discrimination . . .." *Weihaupt v. American Medical Ass'n,* 874 F.2d 419, 430 (7th Cir. 1989) (citing *La Montagne,* 750 F.2d at 1413).

Considering the evidence, and the reasonable inferences therefrom, in the light most favorable to Kovalic, we conclude that there is no credible evidence that any of the reasons proffered by DEC as prompting the decision to discharge Kovalic were a pretext for discrimination.[11]

---

varying accounts of the facts [which would] allow[ ] the jury to believe one account and disbelieve the other."

[11]The remainder of Kovalic's arguments center around his performance in the job over the seven or so years he held it, and he spends considerable time outlining the problems involved in Fabdec's acquisition of DEC A/S's inventory, etc., in early 1985. But losses engendered by this transfer do not appear to have been specifically offered as a reason for his discharge. It is true that Fabdec was experiencing an unprofitable period, and that some of this unprofitability could be traced to the transfer. It is also true that one of the reasons offered by DEC for the firing was that it would produce a significant "cost reduction"—which it did. It does not follow, however, that DEC either reneged on its statement to Kovalic that it was not holding him responsible for the transfer losses, or that the cost savings engendered by his replacement were simply a pretext for age discrimination.

As for his past job performance, here, too, DEC's concern began in 1985, when the Westfalia and other problems came to a head. Moe testified, for example, that he regarded Kovalic's performance to be satisfactory until September of 1985.

Much the same may be said for Kovalic's assertions that

885

We conclude the trial court erred when it denied DEC's motion for judgment notwithstanding the verdict. For the same reasons, a new trial in the interest of justice was not warranted.

We reverse and remand to the trial court with directions to enter judgment in DEC's behalf, dismissing Kovalic's complaint.

*By the Court.*—Orders reversed and cause remanded with directions.

---

"dishonesty" or "gross job performance" are somehow involved here. The assertions are based on a letter written by DEC's English lawyers in response to claims presented by Kovalic's counsel under English law. Throughout, DEC has disclaimed any suggestion that Kovalic was dishonest or that his job performance was "gross." Moe specifically denied this, testifying that his primary complaint had nothing to do with allegations of dishonesty, etc., but simply that Kovalic "used bad business judgment." Here, as in the other examples, a plaintiff's proof on pretext must focus on the "specific reasons for his discharge" as advanced by the employer. *La Montagne,* 750 F.2d at 1414.