J.C. Holdings, LLC, Plaintiff-Respondent,
v.
Sekao, Inc., Defendant-Appellant.
No. 03-1938.
Court of Appeals of Wisconsin.
Opinion Filed: March 2, 2005.
Before Anderson, P.J., Nettesheim and Snyder, JJ.
¶1 PER CURIAM.
Sekao, Inc., has appealed from a judgment awarding damages of $200,000 to the respondent, J.C. Holdings, LLC. We affirm the judgment.
¶2 This case arises from a failed commercial real estate transaction. In July 1999, J.C. Holdings and Sekao entered into a contract for the sale of a 125-acre parcel of land in the town of Raymond. J.C. Holdings wanted to develop the property for the operation of a fireworks business. The property included a small residence and outbuilding. Two elderly sisters lived in the residence subject to a life estate. The residence was served by a well and septic system.
¶3 The real estate contract was executed by Chris Pignotti on behalf of J.C. Holdings, and by Glenn Oakes, Jr., on behalf of Sekao. The contract provided for a sale price of $1,500,000, and set a closing date of October 29, 1999. Paragraph one of Addendum WS to the contract provided in material part:
Sellers agree to provide Buyer, within 15 days of the acceptance of this Offer, at Sellers' expense, with a sanitary disposal system inspection report ... dated within 180 days prior to the date of closing, which report shall include a visual inspection of the interior of the septic tank after normal pumping. Buyer has the right and responsibility to retest the sanitary disposal system at Buyer's expense prior to closing. If either Buyer or Sellers' professional test results and/or inspection report discloses any material defect which makes the sanitary disposal system unacceptable to Buyer or Buyer's lender, the same shall be communicated to Sellers, in writing, within 5 days of Buyer's receipt of Sellers' test results and inspection reports.
Sellers shall, at Sellers' option, have 5 days after receipt of said notice in which to agree to correct claimed defects or this Contract shall be null and void with all earnest money being returned to Buyer.
....
Parties agree to extend the closing date to accomplish the above.
¶4 Paragraph two of Addendum WS contained similar provisions, stating:
Sellers agree to provide Buyer, within 15 days of the acceptance of this Offer, at Sellers' expense, with a bacteriologically safe water test from a qualified testing agency, and a well system inspection report ... dated within 90 days prior to the date of closing. Buyer has the right and responsibility to retest the subject well at Buyer's expense prior to closing. If either Buyer or Sellers' professional test results and/or inspection report discloses any material defect which makes the well system unacceptable to Buyer or Buyer's lender, the same shall be communicated to Sellers, in writing, within 5 days of Buyer's receipt of Sellers' test results and inspection reports.
Sellers shall, at Sellers' option, have 5 days after receipt of said notice in which to agree to correct claimed defects or this Contract shall be null and void with earnest money being returned to Buyer.
....
Parties agree to extend the closing date to accomplish the above.
¶5 Sekao did not provide well and septic inspection reports to J.C. Holdings until October 26, 1999, three days before the scheduled closing. On October 28, 1999, Pignotti wrote a letter to Sekao's attorney, stating:
On October 26, 1999, I was provided with proposed closing documents, including untimely receipt of ... Well and Sanitary Inspections and Test Results.... Under Addendum WS, the Well and Sanitary Inspections and Reports were to be provided to Buyer within 15 days of acceptance (i.e., on or before August 14, 1999).... In addition, both of these Inspection/Reports are unacceptable. The Well test indicates the water quality is unsafe and this is a nonconforming "pit" well. Upon receipt of the questionable sanitary test, our inspector determined that the septic system may be failing due to seepage into field tiles and that the system does not comply with state and local codes. Under Addendum WS, the parties agree to extend the closing date to remedy these defects.
¶6 On October 29, 1999, Sekao's attorney responded to Pignotti's letter, stating:
Pursuant to paragraphs 1 and 2 of Addendum WS, the Seller hereby notifies Buyer that it declines to correct the claimed material defects and as such the Offer to Purchase is hereby null and void. Your assertion that under this Addendum the parties agree to extend closing date to remedy such defects is incorrect. The extension deals only with acquiring the stated reports. It does not require Seller to remedy any material defects but clearly provides that it is Seller's option to either repair the systems or declare the Offer null and void.
¶7 Pignotti responded on the same day with a hand-delivered letter stating that J.C. Holdings was evaluating the costs it would incur to upgrade the well and septic systems on the property, and that it had not, to date, requested Sekao to make any repairs. Pignotti stated that he was confused by counsel's letter declaring the contract null and void on the ground that Sekao was unwilling to make any corrections. He also expressed concern that Sekao was not acting in good faith, and stated that J.C. Holdings would still like to reach an agreeable conclusion to the transaction.
¶8 While these proceedings were ongoing, Sekao also received an offer to purchase the land from Omega Investments. On October 27, 1999, one day after providing J.C. Holdings with the inspection reports and before receiving Pignotti's response, counsel for Sekao sent a letter to a representative of Omega Investments, asking him to execute a written offer to purchase. On November 23, 1999, Sekao sold the property to Omega Investments for $1,700,000.
¶9 J.C. Holdings subsequently brought this action against Sekao, alleging breach of contract. A jury trial was commenced on May 7, 2002. On May 8, 2002, after J.C. Holdings rested its case, the trial court granted Sekao's motion to dismiss. Several days later the trial court sua sponte informed the parties that it believed it might have erred in granting the motion, and requested briefs on the issue. It subsequently vacated its dismissal order and set the matter for a second trial. At the conclusion of the second trial, the jury returned a special verdict determining that J.C. Holdings did not modify the contract by its conduct to allow submission of the well and septic reports three days prior to the scheduled closing date. The jury also found that Sekao materially breached an essential term of the contract in the timing of its delivery of the well and septic test results. The jury further found that the breach caused damage to J.C. Holdings.[1]
¶10 Sekao raises four issues on appeal: (1) whether the trial court erred when it reconsidered its order granting the motion to dismiss at the first trial; (2) whether the trial court erred in denying Sekao's motion for judgment notwithstanding the verdict after the second trial; (3) whether the verdict at the second trial should have been set aside on the ground that no credible evidence supported the jury's determination that Sekao materially breached the contract; and (4) whether credible evidence supported the jury's determination that Sekao's late submission of the well and septic reports caused damage to J.C. Holdings. None of these issues provide a basis for relief on appeal.
¶11 We conclude that the trial court properly reconsidered its order dismissing the action at the first trial. We also commend the trial court for recognizing its error and correcting it as quickly as it did, thus avoiding a needless appeal after the first trial.
¶12 Sekao moved for dismissal at the close of J.C. Holdings' presentation of its case at the first trial, contending that J.C. Holdings had failed to present any evidence establishing that the well and septic reports were material to the contract, and that Sekao had a right to declare the contract null and void based on Pignotti's October 28, 1999 letter. The trial court initially granted the motion on the ground that Sekao's late submission of the well and septic reports was not a material breach of the contract, and that Sekao properly declared the contract null and void because Pignotti notified it that the well and septic systems were unacceptable. The trial court subsequently reconsidered its decision after concluding that it had improperly relied upon the testimony of David Albrecht, a banker and defense witness who testified that the bank's business loan to J.C. Holdings was not contingent upon the well and septic reports.[2]
¶13 When deciding a motion to dismiss at the close of the plaintiff's presentation of its case, a trial court is entitled to consider only the proof that has been offered by the plaintiff. Beacon Bowl, Inc. v. Wisconsin Elec. Power Co., 176 Wis. 2d 740, 788, 501 N.W.2d 788 (1993). When the motion is based on a claim that the evidence is insufficient as a matter of law to support a verdict in the plaintiff's favor, the motion may not be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party. Id.; see also WIS. STAT. § 805.14(1) and (3) (2003-04).[3]
¶14 In granting the motion to dismiss at the conclusion of the plaintiff's case, the trial court noted that Sekao had failed to comply with the provisions of the contract requiring it to provide J.C. Holdings with septic and well inspection reports within fifteen days of acceptance of the offer. However, relying on Albrecht's testimony, it concluded that no reasonable jury could determine that Sekao's breach was material because the bank was not concerned with the quality or safety of the well and septic systems. It therefore concluded that Sekao's breach of the contract was not material, and that it was Pignotti who "quashed the deal" when he informed Sekao that the reports were unacceptable, triggering Sekao's right to declare the contract null and void.
¶15 It is clear from the trial court's decision that it relied on the testimony of a defense witness in determining that Sekao did not materially breach the contract when it provided untimely well and septic reports. In fact, in its decision reconsidering the order granting the motion to dismiss, the trial court stated that in its mind, Albrecht's testimony constituted the "nail in the coffin" for the plaintiff's case. Because the trial court relied on proof that was offered by Sekao rather than J.C. Holdings in violation of Beacon Bowl, 176 Wis. 2d at 788, it properly reconsidered and vacated its order granting the motion to dismiss.
¶16 Sekao argues that the trial court properly considered Albrecht's testimony. It contends that Albrecht's trial testimony was consistent with his deposition testimony, and thus had to be viewed as undisputed at the commencement of the trial. This argument is specious. Albrecht's deposition testimony was not evidence presented at trial. In addition, the argument ignores the Beacon Bowl rule that when deciding a motion to dismiss at the close of the plaintiff's presentation of its case, the trial court is limited to considering the proof that has been offered by the plaintiff.[4]
¶17 Sekao also argues that, even ignoring Albrecht's testimony, nothing in the record supported J.C. Holdings' claim that Sekao's late submission of the well and septic reports was material to the contract. However, Pignotti testified at trial that he was concerned about his potential liability for contamination caused by bad water or a defective septic system. He indicated that this was the reason he included the provisions requiring well and septic reports in the offer to purchase. A fact finder could reasonably conclude that even if the life estate of the women living on the property included an obligation to maintain the well and septic systems, Pignotti had a right to remain concerned about potential future liability, rendering the well and septic reports material to the contract.[5] As determined by the trial court in reconsidering its order, a jury issue therefore existed as to whether Sekao's untimely production of the reports constituted a material breach of the contract.[6]
¶18 In contending that the trial court properly granted the motion to dismiss at the first trial, Sekao also contends that it was entitled to declare the contract null and void based on Pignotti's October 28, 1999 letter. It contends that the trial court's reliance on Albrecht's testimony was therefore immaterial because J.C. Holdings' case was properly dismissed regardless of that testimony. At the conclusion of the second trial, Sekao moved for judgment notwithstanding the verdict on essentially the same ground, arguing that it was entitled to declare the contract null and void as a matter of law based on Pignotti's letter. Because these arguments are both premised on the claim that Pignotti's letter entitled Sekao to declare the contract null and void, we will address them together.
¶19 A motion for judgment notwithstanding the verdict does not challenge the sufficiency of the evidence to support the verdict, but rather whether the facts found are sufficient to permit recovery as a matter of law. Logterman v. Dawson, 190 Wis. 2d 90, 101, 526 N.W.2d 768 (1994). It admits for purposes of the motion that the findings of the verdict are true, but asserts that judgment should be granted to the moving party on grounds other than those decided by the jury. Kolpin v. Pioneer Power & Light Co., 162 Wis. 2d 1, 28, 469 N.W.2d 595 (1991). Review of the trial court's decision on a motion for judgment notwithstanding the verdict presents a question of law which this court reviews independently of the trial court, although with the benefit of its analysis. Danner v. Auto-Owners Ins., 2001 WI 90, ¶41, 245 Wis. 2d 49, 629 N.W.2d 159.
¶20 The evidence did not permit the trial court to determine that Sekao was entitled to declare the contract null and void as a matter of law. In the October 28, 1999 letter, Pignotti did not state that the well and septic systems were unacceptable; he merely stated that the "Inspection/Reports" were unacceptable. Moreover, while citing problems with the well test and pointing out that J.C. Holdings' own inspection of the septic system indicated that it might be failing, Pignotti never expressly declared that the well and septic systems were unacceptable to J.C. Holdings, or requested that Sekao make any repairs to those systems.
¶21 An issue of fact was therefore presented for the jury as to whether Pignotti's letter triggered Sekao's right to declare the contract null and void. Evidence presented at trial supported Pignotti's allegation that he was not declaring the systems unacceptable or requesting that Sekao remedy any defects. At trial, Pignotti testified that the inspection reports provided by Sekao were inadequate. He testified that the sanitary system report did not indicate that the inside of the septic tank was pumped and visually inspected, as expressly required by the parties' contract. In addition, he testified that the well inspection report contained a checked box indicating that the water was bacteriologically safe; however, laboratory results attached to the report stated that the water was unsafe. Furthermore, the cover letter from Sekao's counsel which transmitted the reports to Pignotti stated that the water had tested unsafe due to coliform, but that the water had been chlorinated by Sekao and would be retested on October 26, 1999, with the new test results expected by October 28, 1999.
¶22 Pignotti testified at trial that because of these deficiencies and because he had not received the results of the new water test performed after the October 1999 chlorination, he wrote the October 28, 1999 letter stating that the reports were unacceptable. He testified that he never informed Sekao that the systems were unacceptable or requested repairs, nor did he inform Sekao that he did not intend to close the real estate transaction. Based upon this evidence, the jury could reasonably reject Sekao's contention that J.C. Holdings declared the systems unacceptable, entitling Sekao to declare the contract null and void.
¶23 Sekao next argues that its motions to change special verdict answers or for dismissal or a directed verdict should have been granted because there was no credible evidence to support a finding that Sekao materially breached the contract. A motion challenging the sufficiency of the evidence to support a verdict may not be granted unless, considering all credible evidence and the reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to support a finding in favor of such party. Richards v. Mendivil, 200 Wis. 2d 665, 670, 548 N.W.2d 85 (Ct. App. 1996). This standard applies to Sekao's motion to change the jury's special verdict answers, and to its motions to dismiss or for a directed verdict. See id. Moreover, in addressing a motion to change a jury's special verdict answer, the trial court must defer to the jury's assessment of the credibility of witnesses and the weight to be given their testimony, and must accept the reasonable inferences drawn by the jury. Id. at 671. On appeal, we are guided by these same rules. Id.
¶24 A motion to change a jury's answer to a special verdict question which challenges the sufficiency of the evidence to support the answer must be considered in the context of the instructions given to the jury. Kovalic v. DEC Int'l, Inc., 161 Wis. 2d 863, 873 n.7, 469 N.W.2d 224 (Ct. App. 1991). Based upon Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 185, 557 N.W.2d 67 (1996), the jury was instructed that "[a] breach of contract is not `material' unless it is so substantial as to destroy the essential object of the contract." Sekao contends that no credible evidence supports the jury's finding that the late submission of the well and septic system reports was material because: (1) the well and septic systems had no relevancy to J.C. Holdings' purpose in buying the land, which was to develop its fireworks business; (2) the well and septic systems were subject to a life estate which required the then-residents to maintain the systems; (3) J.C. Holdings received the reports with sufficient time to review them and conduct its own inspections; and (4) J.C. Holdings waived the materiality of the reports by failing to protest Sekao's delay in providing the reports until shortly before the scheduled closing date.
¶25 Sekao's contention that the well and septic systems had no relevancy to the contract fails for reasons already discussed. At the second trial, as at the first, Pignotti testified that he inserted the well and septic inspection provisions in the offer to purchase because he was concerned with potential liability for contamination if the systems were leaking or otherwise defective. Pignotti testified that he was concerned about J.C. Holdings' liability because it would be the owner of the property regardless of whether the elderly sisters residing on the property were responsible for "all normal maintenance" under the life estate. He indicated that he wanted to ascertain the condition of the well and septic systems in order to evaluate his potential future liability and because J.C. Holdings might be required to ultimately replace those systems. Based upon his testimony, the jury was entitled to find that provision of the inspection reports was material to J.C. Holdings' purchase of the land, regardless of whether the water and septic systems directly affected the fireworks business and regardless of whether the elderly sisters who lived in the residence were responsible for maintaining the systems.
¶26 The jury was also entitled to find that providing the reports three days before the scheduled closing was insufficient to permit J.C. Holdings to evaluate them and decide how it wanted to proceed, particularly since the contract itself gave J.C. Holdings five days after receipt of the reports to notify Sekao if the systems were unacceptable to it. The mere fact that J.C. Holdings retained an inspector during this period and obtained additional information concerning the condition of the septic system did not prevent the jury from determining that J.C. Holdings was deprived of adequate evaluation and response time in violation of the terms of the contract.
¶27 The jury was also entitled to reject Sekao's argument that J.C. Holdings waived the materiality of the reports by failing to object to Sekao's delay in providing the reports until shortly before the scheduled closing date. In its special verdict, the jury expressly found that J.C. Holdings did not modify the contract by its conduct to allow submission of the well and septic reports three days prior to the scheduled closing date. This finding is supported by evidence indicating that J.C. Holdings asked Sekao for the reports, and never told Sekao that it was not required to provide them. Although J.C. Holdings did not ask for the reports until October 1999, contrary to Sekao's argument the jury was not required to find that this delay constituted waiver of its interest in the reports, particularly since the contract provided that the closing date would be extended to accomplish Sekao's provision of the reports and the five-day period afforded J.C. Holdings for responding. The jury could reasonably conclude that it was Sekao's fault that the reports were provided only three days before the scheduled closing, and that J.C. Holdings never waived its right to the reports and to the fiveday response time.
¶28 Sekao's final argument is that, even if the late submission of the reports was a material breach of the contract, credible evidence does not support the jury's finding that the breach caused damage to J.C. Holdings. In this argument, Sekao reiterates its contention that the real estate transaction failed because of Pignotti's October 28, 1999 letter and his follow-up letter of October 29, 1999, not because of Sekao's untimely provision of the well and septic reports. However, as already discussed, the jury was not required to accept Sekao's claim that Pignotti declared the systems unacceptable. The jury could reasonably find that the reports provided by Sekao were untimely and inadequate, that Pignotti never demanded that repairs be made by Sekao, and that J.C. Holdings was entitled to clarification of the information in the reports and five days to decide whether to request repairs from Sekao. Since Sekao declared the contract null and void without affording J.C. Holdings the five days provided by the contract, the jury could find that the failure to close the sale was caused by Sekao. It could also find that J.C. Holdings was damaged when Sekao failed to close the sale since it was unable to purchase property which had a fair market value of $1,700,000, $200,000 more than J.C. Holdings' purchase price.
By the Court.  Judgment affirmed.
NOTES
[1] Damages of $200,000 were subsequently awarded by the trial court based on the parties' pretrial stipulation as to the amount of damages.
[2] Although he was a defense witness, Albrecht had been called out of order and testified before the trial court addressed Sekao's motion to dismiss at the close of the plaintiff's case.
[3] All references to the Wisconsin Statutes are to the 2003-04 version.
[4] Contrary to Sekao's contentions, Lambrecht v. Kaczmarczyk, 2001 WI 25, ¶23, 241 Wis. 2d 804, 623 N.W.2d 751, dealt with summary judgment methodology and provides no support for its argument that the trial court could rely on Albrecht's testimony when deciding the motion to dismiss.
[5] The life estate provided that the sisters were responsible for "all normal maintenance." It did not specifically refer to the well or septic systems.
[6] Sekao also argues that even if the trial court erred in relying on Albrecht's testimony at the close of the plaintiff's case, it should not have granted a new trial because there was no basis to conclude that the outcome of the new trial would be different. Sekao reasons that the trial court would have been able to consider Albrecht's testimony later in the trial, and that its consideration of the testimony in deciding the motion to dismiss was therefore harmless. This argument ignores that the jury, not the trial court, was the fact finder at the trial. The jury was entitled to accept Pignotti's testimony that the reports mattered to him regardless of whether they affected J.C. Holdings' ability to obtain financing.