THORP SALES CORPORATION, a Wisconsin corporation, Plaintiff-Appellant,

v.

GYURO GRADING COMPANY, INC., a Wisconsin corporation, and James Gyuro, Defendants-Respondents.

GYURO GRADING CO., INC., a domestic corporation, Plaintiff-Respondent,

v.

THORP FINANCE CORPORATION, a domestic corporation, Defendant-Appellant.†

Court of Appeals

*No. 81–598. Submitted on briefs December 9, 1981.—Decided February 19, 1982.*
(Also reported in 319 N.W.2d 879.)

† Petition to review granted.

For the plaintiff-appellant and defendant-appellant the cause was submitted on the briefs of *J. Michael End* of *Gray & End* of Milwaukee.

For the defendants-respondents and plaintiff-respondent the cause was submitted on the brief of *Stephen R. Miller* of Milwaukee.

Before Moser, P.J., Randa, J., and Brown, J.

MOSER, P.J. Thorp Sales Corporation (Thorp) and Thorp Finance Corporation (Thorp Finance) appeal from a judgment dismissing Thorp's action for breach of contract against Gyuro Grading Company, Inc., and James Gyuro (collectively Gyuro) and awarding Gyuro judgment in the amount of $1600. We reverse the judg-

ment and remand the matter for a determination of the amount of damages to be awarded to Thorp.

On December 2, 1975, Thorp entered into an auction service agreement with Gyuro whereby Thorp agreed "to advertise, conduct and clerk an auction sale" of all equipment listed on Thorp Finance's security agreement. Thorp was to conduct the auction sale without reserve or minimum for an eight percent commission to be paid from the proceeds of the sale. By its terms the agreement was not subject to cancellation without the written consent of Thorp. The sale was to be held on or about April 17, 1976.

The equipment listed on the security agreement consisted of approximately 165 pieces of construction equipment which represented collateral for a loan made by Thorp Finance to Gyuro on December 29, 1975. In March, 1976, Thorp and Gyuro agreed that only fifteen pieces of equipment would be sold at the Thorp auction to be held on April 10, 1976. Thorp agreed to the reduction after determining that the value of those fifteen pieces covered the balance of Thorp Finance's loan to Gyuro.

On March 22, 1976, Gyuro sold one of the fifteen items. The proceeds were paid to Thorp Finance to release Thorp Finance's security interest. Thorp Finance paid Thorp $1600 of the proceeds, representing the eight percent commission on the item, and credited Gyuro with the remainder.

Thorp advertised its sale extensively. Several days before April 10, 1976, Gyuro notified Thorp that the equipment would not be brought to the auction.

On April 9, 1976, Thorp commenced an action seeking a preliminary injunction requiring Gyuro to supply the fifteen pieces for the auction. Judge John A. Decker denied the injunction, ruling that adequate remedies at law were available and that time constraints made it im-

possible for Gyuro to present a defense. The auction was held as planned on April 10, 1976, without the Gyuro equipment.

On May 13, 1976, Thorp served an amended summons and complaint alleging that Gyuro breached its contract by refusing to bring the equipment to the auction. Thorp sought $16,000 for lost commissions and $75,000 for loss of business. Gyuro answered and counterclaimed that Thorp had breached the contract by changing the date and site of the sale. On September 15, 1976, Gyuro commenced a lawsuit against Thorp Finance seeking to recover the $1600 which it claimed should have been credited to its account.

The actions were consolidated on February 17, 1977. Gyuro sought summary judgment. At a hearing on the motion for summary judgment, Judge Decker determined: (1) that Gyuro was liable to Thorp for breach of the auction agreement; (2) that Gyuro's claim that Thorp breached the auction agreement was without merit; and (3) that Gyuro was entitled to a setoff or credit of $1600 against damages recovered by Thorp from Gyuro.

The court of appeals affirmed the order.[1] The Wisconsin Supreme Court denied review.

On August 17, 1979, a trial was held on the issue of damages. The record reflects that Thorp abandoned any claim for expenses and future profits and sought to recover only eight percent of the anticipated proceeds from the sale of the items included in the auction sales agreement. The evidence produced related only to the auction value of the equipment.

In its written decision dated December 28, 1980, the trial court found that Thorp was not "entitled to damages for lost profits based upon Gyuro's breach, even if

[1] *Thorp Sales Corp. v. Gyuro Grading Co.*, Nos. 77–443 & 77–444 (Wis. Ct. App. Sept. 27, 1978).

those damages could be ascertained to a reasonable degree of certainty," that Thorp had not proven damages to a reasonable degree of certainty and that Gyuro should be awarded $1600 in damages because no damages were awarded to Thorp against which Gyuro could set off the $1600 commission.

The issues on appeal are:

1. Whether Thorp is entitled to recover as damages the commissions it would have received had Gyuro complied with the auction contract by bringing the equipment to the auction;
2. Whether there was sufficient evidence adduced at trial to provide an adequate basis for calculating Thorp's commissions; and,
3. Whether Gyuro is entitled to a judgment against Thorp Finance for the $1600 that the original trial judge ruled would be set off against any damages Thorp would be entitled to.

## RECOVERY OF COMMISSIONS

Whether Thorp is entitled to recover its lost commissions is a question of law. We address such questions without giving special deference to the trial court.[2]

Although there is Wisconsin case law regarding the liability of a seller or the auctioneer to prospective buyers,[3] there is apparently no Wisconsin precedent pertaining to the liability of a seller to an auctioneer in the event of the seller's breach of the auction agreement. The record reflects that the trial court based its holding on several decisions from other jurisdictions regarding

[2] *First Nat'l Leasing Corp. v. City of Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977).

[3] *E.g., Zuhak v. Rose*, 264 Wis. 286, 58 N.W.2d 693 (1953); *Keske v. Boeder*, 168 Wis. 369, 170 N.W. 247 (1919); *Crowley v. Hicks*, 98 Wis. 566, 74 N.W. 348 (1898).

auction sales.[4] We have reviewed those decisions and determine that only one, *C.E. Girardey & Co. v. Stone,*[5] concerns the relationship between the seller and auctioneer.[6]

In *Girardey,* the owner "instructed" the auctioneers to advertise property for sale and then sold the property by private sale before the date of the auction. The auctioneers brought suit to recover their commission and expenses. The court held that the auctioneers could recover for their expenses in advertising the property but were not entitled to their commission.

We believe that *Girardey* is distinguishable from the case at hand. The owner in *Girardey* merely agreed to make his property available for sale. He did not, by the terms of the agreement, have a duty not to terminate. The court in *Girardey* did not find that the owner breached the contract by refusing to deliver. We conclude that *Girardey* does not resolve the question of

---

[4] *Jackson v. L.S. Brown Co.,* 71 S.E.2d 521 (Ga. App 1952); *Benjamin v. First Citizens Bank & Trust Co.,* 287 N.Y.S. 947 1936); *Anderson v. Wisconsin C. Ry. Co.,* 120 N.W. 39 (Minn. 1909); *C.E. Girardey & Co. v. Stone,* 24 La. Ann. 286 (1872); *Manser v. Back,* 67 Eng. Rep. 1239 (1848). *See* Annot., 37 A.L.R. 2d 1049 (1954).

[5] Note 4, *supra.*

[6] *Benjamin v. First Citizens Bank & Trust Co., Anderson v. Wisconsin C. Ry. Co.,* and *Manser v. Back, supra* note 4, all deal with the legal relationship of the buyer and seller in an auction situation. In *Jackson v. L.S. Brown,* the owner of a farm sought to recover damages he allegedly sustained when the company he hired to erect an auction tent delayed in constructing the tent. The court quoted the general rule that an owner may withdraw his property from auction any time before the hammer falls, determined that damages were not the result of breach of contract, and held that because there was no duty on the part of the seller to hold the auction, the claimed damages were not within the contemplation of the parties.

whether Gyuro's breach renders Gyuro liable for damages consisting of Thorp's lost commissions.

It is well-established that as a general rule the auctioneer is the agent of the seller.[7] Therefore, the rights and liabilities of the auctioneer are governed by general agency law principles.[8]

Gyuro argues that the rules governing the termination of real estate brokers' listing contracts are applicable here and mandate the determination that Thorp cannot recover its commissions. Thorp contends that the real estate commission cases are not appropriate precedents for an auction commission case, that, in any event, such cases support Thorp's position, and that the rules governing termination of an agent's exclusive sales contract should be followed.

We believe that Thorp's position under the auction agreement is more akin to that of a real estate broker than to that of an exclusive sales agent.[9] We accordingly hold that the rules governing the termination of real estate listing contracts are applicable here. We determine that under those rules, Thorp is entitled to recover as damages the profits it lost as a result of Gyuro's breach which are proven to a reasonable certainty and that Thorp's lost profits coincide with its lost commission less any expenses saved by virtue of Gyuro's breach.

---

[7] *Faultersack v. Clintonville Sales Corp.*, 253 Wis. 432, 435, 34 N.W.2d 682, 683 (1948). Restatement (Second) of Agency § 1, comment *e* (1958).

[8] 7 Am. Jur. 2d *Auctions and Auctioneers* § 60 (1980).

[9] Like the broker under the typical real estate listing contract, Thorp was hired to effect the transfer of property within a particular period of time with compensation dependent upon the result achieved. *See generally* Restatement (Second) of Agency §§ 445–48 and comments (1958); W. Seavey, Agency § 171 (1964).

Under the general rule, a real estate broker who is hired to "procure a buyer" within the time set forth in the listing contract, earns the commission only if the broker produces a purchaser who is ready, willing and able to buy on the terms specified before the contract expires.[10] Thus, it has been held that a broker may not recover the commission in an action on the contract unless the broker establishes that he or she has secured an offer in substantial compliance with the listing contract.[11]

Where a broker does not allege that the broker earned the commission by obtaining an appropriate purchaser or offer, but contends instead that the fault or misconduct of the seller prevented the broker from performing or terminated the contract before its stated expiration date, the action is one for breach of contract or *quantum meruit*.[12] An offer in substantial compliance with the listing contract is not a prerequisite to recovery in such a case.[13] Where, in a breach of contract action, a broker proves that the seller in bad faith prevented the broker from performing under the contract, the broker may recover the reasonable value of the services.[14] Where the seller prematurely terminates the broker's agency, "he renders himself liable, unless such revocation is for cause, for such damages as are the proximate result of his termination of the employment contract. This as-

[10] *Mansfield v. Smith*, 88 Wis. 2d 575, 585–86, 277 N.W.2d 740, 745 (1979); *Winston v. Minkin*, 63 Wis. 2d 46, 51, 216 N.W.2d 38, 41 (1974); *Peter M. Chalik & Assoc. v. Hermes*, 56 Wis. 2d 151, 157, 201 N.W.2d 514, 518 (1972).

[11] *Chalik, supra* note 10, at 163, 201 N.W.2d at 521.

[12] *Id.* at 157, 201 N.W.2d at 517.

[13] *Rollie Winter Agency, Inc. v. First Cent. Mortgage*, 75 Wis. 2d 4, 10, 248 N.W.2d 487, 490 (1977).

[14] *Id.*

sumes, of course, that the contract is supported by consideration and is otherwise binding."[15]

The damages for breach of a real estate listing contract include "any profits which plaintiff could show would have accrued to the plaintiff had the contract not been improperly terminated; taking into account the probability of procuring a buyer on the seller's terms, and all other relevant circumstances."[16] Comments to section 445 of the Restatement (Second) of Agency (1958) make it clear that the profits lost as a result of the seller's breach may consist of the broker's commission minus expenses saved by virtue of the breach. Comment *a* to section 445 provides in part:

If the principal, in breach of contract, prevents the agent from accomplishing the result upon which the agreed compensation is conditioned, the agent is entitled to damages for such breach or, as an alternative, the fair value of his services in attempting to accomplish it. The amount of recovery for damages in such a case is not the specified compensation as such, but the damages which the agent suffers by reason of the breach of contract. Such damages may coincide in amount with the agreed compensation; if, however, the agent would have had to incur further expense in order to earn such compensation, and these expenses have been saved to him, he is entitled only to a sum equal to the agreed compensation minus the expenses he has thereby saved.

Comment *f* to the same section discusses the broker's right to damages under a bilateral contract of employment and provides:

In such a case, the question whether or not the broker has earned his stated commission depends upon the same questions of interpretation of the principal's promise to

---

[15] *Sinden v. Laabs*, 30 Wis. 2d 618, 621, 141 N.W.2d 865, 866–67 (1966) (footnote omitted).

[16] Wis J I—Civil 3740. *See* 22 Am. Jur. 2d *Damages* § 174 (1965).

pay the commission as have been considered in Comments *c-e* on this Section. If, however, the broker has been prevented from procuring a customer as a result of the principal's breach of contract, as for example, where the principal, having bound himself to give the broker a stipulated time in which to find a customer, wrongfully revokes, the broker can recover, as damages for breach of contract, the amount of the commission which he can show he would have earned, minus the expenses he would have had to incur to earn it.

Under the rules just stated, it is clear that Thorp is not entitled to recover its commission per se. Thorp did not do all that it was required to do under the auction agreement and consequently did not earn its commission.[17] Also, Thorp did not allege or seek to prove bad faith prevention of performance by Gyuro.[18] However, the rules do not preclude Thorp's recovery of its lost profits.[19]

The auction service agreement is a bilateral contract "binding both parties by mutual promises."[20] Thorp's

[17] *See* notes 10 and 11, *supra* and accompanying text.

[18] *See* note 14, *supra* and accompanying text.

[19] The trial court recognized that under the case law pertaining to real estate brokers' contracts Thorp is entitled to recover its lost profits, if ascertainable. The written decision of the trial court provides in part:

The action before the court is an action on the contract and the plaintiff is suing for the commission it would have received had the defendant complied with the terms thereof. The action is also for breach of contract and the damages sought is a percentage of the amount the items would have sold for. Neither theory provides relief to the plaintiff. The action on the contract because an agent is not entitled to recover commissions *in futuro* for item(s) not sold, the action on breach for damages because the damages themselves are the commissions (except for the alleged loss of reputation to the plaintiff which claim has been abandoned by the plaintiff and on which no proof was submitted) which are unascertainable to a reasonable certainty.

[20] *Sinden, supra* note 15, at 620, 141 N.W.2d at 866.

promise "to advertise, conduct and clerk an auction sale" of the Gyuro equipment is sufficient consideration for Gyuro's promises to furnish Thorp with a list of items to be advertised, to make the items available for sale and to provide an appropriate sale site.[21]

We conclude that if Thorp has met its burden of proving its damages to a reasonable certainty,[22] Thorp is entitled to recover as damages the profits it lost as a result of Gyuro's breach.[23] Those profits are equal in amount to Thorp's lost commission less any expenses Thorp would have had to incur to earn them.[24]

## ADEQUACY OF PROOF

Damages for breach of contract are recoverable only to the extent that the evidence permits the loss to be established to a reasonable degree of certainty.[25] However, such damages need not be ascertainable with abso-

---

[21] The pertinent clause of the auction service agreement provides:

11. Owner agrees: (a) to furnish Thorp with a complete descriptive list of all items of personal property (herein called the Property) as they are to appear in the advertising for sale, and that all Property listed and advertised, will be available for sale, and will be sold to the highest bidder without reserve or minimum; (b) on request, to provide a suitable sale site of ample space for conducting the sale and adequate parking, toilet and clerking facilities; and (c) to provide protection for buyers' items for a reasonable time.

[22] See discussion infra.

[23] The question of whether Thorp sustained lost profits as a result of Gyuro's breach is not before us. The matter of causation was resolved by Judge Decker's decision which found Gyuro liable to Thorp for breach of contract. This decision was affirmed on review. See note 1, supra.

[24] See note 16, supra and accompanying text.

[25] Restatement (Second) of Contracts § 352 (1981).

lute exactness or mathematical precision.[26] The evidence is sufficient if it enables the trier of fact to make a fair and reasonable approximation.[27] The plaintiff bears the burden of establishing reasonably certain damages.[28]

In its written decision, the trial court determined that Thorp failed to sustain its burden of proving reasonably certain damage.[29] "This is a question of law which this court can examine but in doing so it must accept the trial court's view of the credibility of the witnesses unless we can say the trial court was wrong on credibility as a matter of law."[30]

The record reflects that both parties produced evidence concerning the value of the fifteen pieces of equipment covered by the auction agreement. Gerald F. Nitke (Nitke), the auctioneer, testified on behalf of Thorp.

[26] *Metropolitan Sewerage Comm'n v. R.W. Construction,* 78 Wis. 2d 451, 462–63, 255 N.W.2d 293, 299 (1977); *Reiman Assoc. v. R/A Advertising,* 102 Wis. 2d 305, 323–24, 306 N.W.2d 292, 302 (Ct. App. 1981).

[27] *Metropolitan Sewerage Comm'n, supra* note 26, at 463, 255 N.W.2d at 299 (1977).

[28] *Schubert v. Midwest Broadcasting Co.,* 1 Wis. 2d 497, 502, 85 N.W.2d 449, 452 (1957).

[29] The pertinent portion of the trial court's decision reads as follows:

Proof of damages in this case has not been made to a reasonable certainty by the greater weight of the credible evidence. The only testimony by the plaintiff as to what damages are appropriate is found in that of Mr. Nitke, who made certain valuations of the property for loan purposes and who testified that auction values would be 30% to 40% higher, and based on that Thorp seeks an award of 8% of the purported "auction value" for the defendant's breach. The problem in determining the amount that each item of Gyuro's *would* have brought at auction is self-evident and the only determination supported by the evidence is that any determination of damages would be self-serving and speculative on the part of each party. [Emphasis in original.]

[30] *Seraphine v. Hardiman,* 44 Wis. 2d 60, 65, 170 N.W.2d 739, 742 (1969).

Nitke testified that he had eighteen years experience in the auction appraisal business, that he had done appraisals for banks, the government and construction businesses and that he had begun the State Fair Park auctions and personally ran them. Nitke's affidavit dated October 28, 1977, indicated that the fifteen pieces had a total auction value of $131,000. Nitke described this value as a conservative figure which represented wholesale value. Nitke estimated the auction value to be thirty to forty percent higher than loan value. Nitke estimated the loan value, which he defined as the distressed sale value, at $89,600.

James Gyuro testified on behalf of Gyuro. James Gyuro testified that he had thirty years experience in buying and selling at auctions. His evaluation affidavit dated October 7, 1977, estimated the value of the fifteen items, as of April 17, 1976, at $89,600. The affidavit indicated that these prices were corroborated by the "Thorp Auction Price Guid [sic]" for its 1976 sales. James Gyuro also testified about the prices which Gyuro paid for some of the equipment when purchased and the prices which many of those items sold for after the date of the auction.

We reject the trial court's finding that Thorp failed to sustain its burden of proof in regard to damages. The facts in the record indicate that the fifteen pieces of equipment had an auction value ranging from $89,600 to $131,000. Significantly, the minimum figure is undisputed. This range of values affords a legitimate basis within which to estimate to a reasonable certainty the amount of lost profits sustained by Thorp as a result of Gyuro's breach.

We reverse the judgment dismissing Thorp's complaint and awarding judgment of $1600 to Gyuro. We remand the matter to the trial court for a determination

of damages to be awarded to Thorp in accordance with this decision. In view of this holding it is unnecessary to reach the remaining issue. The $1600 commission which Thorp has already received is to be credited to Gyuro as provided in the original decision of the trial court.

*By the Court.*—Judgment reversed and cause remanded.