D.L. Anderson's Lakeside Leisure Co., Inc.,
M. Scott Statz and Steve Statz,
Plaintiffs-Respondents,†

v.

Donald Anderson and Anderson Marine, LLC,
Defendants-Appellants.††

Court of Appeals

*No. 2007AP46. Submitted on briefs August 7, 2007.*
*—Decided November 1, 2007.*

2007 WI App 269

(Also reported in 744 N.W.2d 300.)

† Petition to review granted 3/18/08.
†† Cross petition granted 3/18/08.

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Daniel W. Hildebrand* and *Dawn E. Hildebrand,* of *DeWitt Ross & Stevens S.C.,* Madison.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Kevin J. Palmersheim* and *Teresa K. Kobelt* of *Haley Palmersheim, S.C.,* Middleton.

Before Higginbotham, P.J., Vergeront and Lundsten, JJ.

¶ 1. VERGERONT, J. D.L. Anderson's Lakeside Leisure Co., Inc., M. Scott Statz, and Steven Statz filed this action claiming breach of a noncompete clause in an asset purchase agreement and common law trade-name infringement. The defendants, Donald Anderson and Anderson Marine, LLC, appeal the judgment against them entered on a jury verdict for $90,000 in compensatory damages and $180,000 in punitive dam-

ages, an order extending the duration of the noncompete clause, injunctive relief, and attorney fees.

¶ 2. We conclude as follows. (1) With respect to the noncompete claim, there was sufficient evidence of breach of that clause; the $15,000 awarded in compensatory damages was proven to a reasonable degree of certainty; and the court properly extended the duration of the noncompete clause. (2) With respect to the tradename claim, there was sufficient evidence of infringement, but insufficient evidence for any compensatory damages and therefore punitive damages may not be awarded. (3) With one modification, the injunctive relief was a proper exercise of the court's discretion. (4) The attorney fee provision in the asset purchase agreement authorizes attorney fees only for the contract claim, given that there is no proper monetary award on the tradename claim. Accordingly, we affirm in part, reverse in part, and remand with directions.

## BACKGROUND

¶ 3. In the late seventies, Donald Anderson (Anderson) started a business installing piers and boatlifts. Sometime between 1980 and 1982 Anderson named the business D.L. Anderson Company, and he operated the business under that name as well as under the name D.L. Anderson Marine Contractors. Eventually the business grew to offer a range of services and products, including marine contracting, shoreline restoration, rip rapping,[1] landscaping, manufacture, sales and service of marine accessories, docks, piers, lifts and hoists.

---

[1] Trial testimony described "rip rapping" as "dumping crushed rock on the shoreline."

¶ 4. In October 2000, Anderson sold the business to the Statzes pursuant to an asset purchase agreement. Among the purchased assets was the tradename D.L. Anderson Co. The agreement contained a noncompete clause, which provided that for a period of seven years, within a radius of 120 miles of the City of Waunakee, Anderson would not permit his name to be used by any business in competition with the pier and lift business as carried on by the buyer, nor would he engage in such a business.[2] The purchase price of $891,000 was allocated as follows: $400,000 for the noncompete clause, $200,000 for goodwill, $200,000 for equipment, and the remainder for inventory. The Statzes began operating the business under the name D.L. Anderson Co., although the corporation they formed is called D.L. Anderson's Lakeside Leisure Co., Inc.

¶ 5. After Anderson sold the business, he took a job with Pier Pleasure, a Minnesota-based manufacturer and distributor of piers and boatlifts, which distributes its products throughout Wisconsin and four other states. Anderson also formed another business, Anderson Marine, LLC. The Statzes believed this and other conduct violated the noncompete clause and their common law tradename rights in the name D.L. Anderson Co., and they filed this action.[3]

---

[2] The agreement was between D.L. Anderson Co., Inc., and Don and Beth Anderson, on the one hand, and the Statzes, on the other hand. The noncompete clause obligated both the corporation and the Andersons. However, because neither D.L. Anderson Co., Inc., nor Beth Anderson is a party to this action, we refer to Anderson, meaning Don Anderson, as the party obligated by the noncompete clause.

[3] Although D.L. Anderson's Lakeside Leisure Co., Inc., is also a plaintiff, we will refer to the plaintiffs as "the Statzes."

¶ 6. The jury returned a special verdict finding that Anderson had breached the noncompete clause and awarding $15,000 in compensatory damages on this claim. The jury also found that both defendants had infringed on the D.L. Anderson Co. tradename and awarded $75,000 in compensatory damages on this claim; in addition, the jury awarded $160,000 in punitive damages against Anderson and $20,000 in punitive damages against Anderson Marine, LLC. The circuit court denied the defendants' motions after verdict. The court entered a judgment on the verdict, ordered an extension of the duration of the noncompete clause, granted injunctive relief, and awarded the Statzes $118,435 in attorney fees for both claims under the attorney fee provision in the asset purchase agreement.

## DISCUSSION

### I. Contract Claim—Noncompete Clause

¶ 7. The defendants contend there is insufficient evidence to support the jury's finding that Anderson breached the noncompete clause, and the circuit court therefore erred in denying the postverdict motion to change the answer to this question from "yes" to "no." They also contend that the damages for breach of the noncompete clause were not proved to a reasonable degree of certainty and therefore the court erred in not changing the award of $15,000 to zero.

### A. Sufficiency of Evidence on Breach

¶ 8. When we review a challenge to the sufficiency of the evidence to support a jury's verdict, we do not disturb the verdict if any credible evidence supports it,

and we look for credible evidence to sustain the verdict. *Johnson v. Neuville*, 226 Wis. 2d 365, 378, 595 N.W.2d 100 (Ct. App. 1999). The credibility of witnesses and weight afforded their testimony is for the jury to decide, and if more than one reasonable inference may be drawn from the evidence, we accept the inference that supports the verdict. *Id.* If this test is met, it does not matter that the evidence supporting the verdict is contradicted by other evidence, even if the contradictory evidence is stronger; we are therefore not concerned in our inquiry with whether the evidence might have supported a different verdict. *See Wisconsin Cent. Farms, Inc. v. Heartland Agric. Mktg., Inc.*, 2006 WI App 199, ¶ 17, 296 Wis. 2d 779, 724 N.W.2d 364.

¶ 9. A motion to change the answer to a special verdict question that challenges the sufficiency of the evidence must be considered in the context of the instructions given to the jury. *Kovalic v. DEC Int'l, Inc.*, 161 Wis. 2d 863, 873 n.7, 469 N.W.2d 224 (Ct. App. 1991).

¶ 10. The noncompete clause in the asset purchase agreement provided as to Anderson:

> (a) . . . . Anderson covenant[s] and agree[s] that for a period of seven (7) years from the Closing Date [he] will neither permit Anderson's name to be used by nor engage in or carry on, directly or indirectly, either for itself or as a member of a partnership, limited liability company, or as a stockholder, investor, officer or director of a corporation (other than Buyer or a subsidiary or affiliate of Buyer) or as an employee, agent, associate or consultant of any person, partnership or corporation (other than Buyer or a subsidiary or affiliate of Buyer) any business in competition with the Pier and Lift Business as carried on by Buyer.

 (b) The restrictive covenant in this Section 6.5 shall apply within a 120–mile radius or the City of Waunakee, Wisconsin.

The "pier and lift business" is defined in the purchase agreement as "marine contracting, shoreline restoration, rip rapping, landscaping, manufacture, sales and service of marine accessories, docks, piers, lifts, and hoists . . . ."

¶ 11. The jury was asked whether Anderson breached the "name non-competition" provision and the "business non-competition" provision and answered "yes" to both questions. We conclude there was sufficient evidence to support the jury's answers to both questions.

¶ 12. Regarding the business noncompetition provision, the evidence of Anderson's employment by Pier Pleasure supports the jury's finding of a breach of that provision. It was undisputed that Anderson's D.L. Anderson Co. had been selling Pier Pleasure products at the time of the closing and that the Statzes continued to sell Pier Pleasure piers and lifts. It is also undisputed that Anderson began working for Pier Pleasure sometime in December 2002 or January 2003 as a dealer representative in Wisconsin and four other states, and worked for Pier Pleasure for about eight months. Anderson's job description was to "establish new dealers to expand Pier Pleasure's dealer network and continually support Pier Pleasure dealers to display and market Pier Pleasure products." His duties included setting and maintaining minimum sales performance with each dealer, obtaining sales forecasts from each dealer, helping dealers troubleshoot, following up on warranty issues, training for Pier Pleasure products, and supporting dealers at shows to promote the products. While

employed by Pier Pleasure, Anderson helped find and establish three new Pier Pleasure dealers in the 120–mile radius of Waunakee and these continued as Pier Pleasure dealers after Anderson ceased working for Pier Pleasure. Anderson also consulted with existing Pier Pleasure dealers within the 120–mile territory and assisted them with sales and assembly of products. He received commissions on sales from the existing dealers if the sales were over a certain amount, and he received a commission of 7% on all the sales of the new dealers.

¶ 13.　Pier Pleasure's owner acknowledged that it is not an advantage to an existing dealer to have a new dealer set up close to the existing dealer. Scott Statz testified that D.L. Anderson Co. had been selling Pier Pleasure products in the areas where the new dealers now operated, had regular customers there, and had planned to expand in these areas.

¶ 14.　The defendants argue that Anderson's work for Pier Pleasure was not a violation of the noncompete clause because the Statzes' D.L. Anderson Co. was not in the business of being a factory representative. However, the asset purchase agreement prohibits Anderson from "engag[ing] in . . . indirectly . . . as an em-ployee . . . or consultant of any person any business in competition with the Pier and Lift Business as carried on by [the Statzes]." A jury could reasonably conclude from this evidence that Anderson, as an employee for Pier Pleasure, was indirectly engaged in a business in competition with the Statzes' pier and lift business because he was establishing, assisting, and consulting with dealers who were competing with the Statzes' sale of Pier Pleasure's piers and lifts.

¶ 15. Regarding the name noncompetition provision, there was undisputed evidence that in the fall of 2003, after forming a company called Anderson Marine, LLC, Anderson acquired a business known as The Sailboat House that is adjacent to the Statzes' D.L. Anderson Co. Anderson testified that there is a marsh and a railroad between the two businesses and that the distance on the highway between the entrances to the businesses is one mile. Anderson initially operated his new business under the name of "The Sailboat House at Anderson Marine," although "Anderson Marine" was used exclusively in websites and telephone pages. Anderson began using the name The Boat House of Madison approximately a year and a half after acquiring his new business, but at the time of trial "Anderson" still appeared on some signage. Anderson's new business sells motorboats, sailboats, and marine accessories, which, Anderson testified, include buoys.

¶ 16. The bill of sale accompanying the asset purchase agreement included buoys, from which it can reasonably be inferred that buoys were among the marine accessories that D.L. Anderson Co. sold before the Statzes' purchased it. Scott Statz testified that buoys, paddleboats, and towables were the marine accessories that both the Statzes' D.L. Anderson Co. and Anderson Marine were selling.

¶ 17. This evidence is sufficient for the jury to conclude that Anderson was using his name in a business that was in competition with "the Pier and Lift Business as carried on by the Statzes." The defendants' argument to the contrary is based on their construction of the contract. They contend that the noncompete clause prohibits sales of accessories only if they are unique to the pier and lift business. However, the jury

was not instructed that this was the proper construction of the contract and the defendants do not challenge the jury instructions in this regard. Because the jury was not instructed to the contrary and neither the contract definition of the "pier and lift business" nor the noncompete clause expressly limited "marine accessories" in the way proposed by the defendants, the jury could reasonably conclude that the term included the buoys that the Statzes' D.L. Anderson Co. was selling.

B. Sufficiency of Evidence on Damages

¶ 18. The jury found that $15,000 would compensate the Statzes for the breach of the noncompete.[4] The defendants contend that no damages were proved to the requisite degree of reasonable certainty.

¶ 19. The jury was given the standard instruction on damages in general, WIS JI—CIVIL 1700:

> ... the burden of proof rests upon each person claiming damages to satisfy you by the greater weight of the credible evidence, to a reasonable certainty, that the person sustained damages with respect to the element or elements mentioned in the question and the amount of the damages. The greater weight of the credible evidence means that the evidence in favor of an answer has more convincing power that the evidence opposed to it. Credible evidence means evidence you believe in light of reason and common sense. "Reasonable certainty" means that you are persuaded based upon a rational consideration of the evidence. Absolute certainty is not required, but a guess is not enough to meet the burden of proof.

---

[4] The question was: "If you answered yes to Question 1A [name noncompetition provision] or 1B [business noncompetition provision] (or both), what sum will compensate the Plaintiffs for the breach." The jury was not asked to allocate damages between the two provisions.

The jury was also given this standard instruction on contract damages, Wis JI—Civil 3735:

> The measure of damages for a breach of contract is the amount which will compensate the plaintiff for the loss suffered as a result of the breach. A party who is injured should, as far as it is possible to do by monetary award, be placed in the position in which he or she would have been had the contract been performed. The fundamental basis for an award of damages for breach of contract is just compensation for losses as a result of the breach. A party whose contract has been breached is not entitled to be placed in a better position because of the breach than the party would have been had the contract been performed. The injured party is entitled to the benefit of the agreement, but for the failure of the other party to perform.

¶ 20. When reviewing whether the plaintiff has met its burden with respect to the amount of damages, we bear in mind that, as the jury was instructed here, reasonable certainty, not absolute certainty, is what is required. This means "[t]he evidence is sufficient if it enables the trier of fact to make a fair and reasonable approximation." *Thorp Sales Corp. v. Gyuro Grading Co., Inc.*, 107 Wis. 2d 141, 152–53, 319 N.W.2d 879 (Ct. App. 1982) (footnote omitted). In the context of damages for breach of a noncompete clause in particular, mathematical certainty is not required because such damages by their very nature cannot be "definitely ascertained or determined." *Reiman Assocs., Inc. v. R/A Adver., Inc.*, 102 Wis. 2d 305, 323–24, 306 N.W.2d 292 (Ct. App. 1981).

¶ 21. Applying this standard, we conclude the evidence was sufficient to meet the Statzes' burden of proof that they suffered damages as a result of

488

Anderson's violation of the noncompete clause and that $15,000 is a fair and reasonable approximation of those damages.

¶ 22. Scott Statz testified that D.L. Anderson Co. had lost sales in the geographic areas of the three dealers that Anderson had helped set up. According to Scott, the company had been selling Pier Pleasure products in those areas, had had regular customers there, had planned to expand there, and now could not sell in those areas; thus D.L. Anderson Co. had lost those sales and would lose future sales.

¶ 23. The Statzes introduced into evidence records of their income from all sales and services and the costs of those sales and services for the years 2000 (October through December) through 2004. The gross receipts for new pier installation for 2002 was $32,895; for 2003 it was $12,605. Scott Statz testified that this item was the total of the fixed fees charged for installing a new pier they sold, and he attributed the decline to the existence of the new dealers in areas in which the company had previously had customers. The same item for 2004 is $16,665. These records also show the cost of the total of the labor sold is approximately one-half to two-thirds of the gross receipts from the labor sold. A jury could reasonably infer that the profit lost for the item of new pier installations was approximately $6,750 to $10,145 for 2003, and approximately $5,400 to $8,100 for 2004. This does not include the profit lost from the sale of the new piers themselves.

¶ 24. If the jury chose to believe Scott Statz's testimony, it could reasonably infer that D.L. Anderson Co. had lost sales and would continue to lose sales because of the new dealers. Because there were almost five years left on the noncompete clause, the jury's award represented approximately $3,000 a year for the

remaining years. The jury could have considered the decline in income from new pier installations after 2002, and determined that $3,000 per year represented a fair amount of lost profit for D.L. Anderson Co. from the new dealers given the reasonable inference that the lost profit from pier installations was approximately $6,750 to $10,145 for 2003 and $5,400 to $8,100 for 2004. Those amounts do not even take into account profits from sales of the new piers themselves.

¶ 25. Alternatively, the jury could have considered the exhibit of the retail sales of the three new Pier Pleasure dealers for 2003. The total amount of sales was approximately $64,000. Using the one-half to two-third's ratio of the cost of goods and services to the gross receipts from D.L. Anderson Co.'s records, $3,000 represents approximately 9% to 14% of the profits from the sales of the new dealers for 2003. A jury could reasonably decide that, had Anderson not helped set up the new dealers, some portion of their sales would have been made by D.L. Anderson Co. Three thousand dollars per year is a fairly modest portion, particularly given that the exhibit showed sales for the first year of the new dealers' operations.

¶ 26. The defendants contend that, if the Statzes want to recover damages for sales lost to the new dealers, they must put in more detailed evidence of their profits and losses, citing *Lindevig v. Dairy Equip. Co.*, 150 Wis. 2d 731, 740, 442 N.W.2d 504 (Ct. App. 1989). We do not agree that *Lindevig* imposes that requirement here. In *Lindevig*, a dealer whose dealership had been wrongfully terminated for a period of time sought to prove lost profits based on the evidence of his gross sales for the year before and the year after the period in question and on his testimony that he had a gross markup of 35%; he introduced no evidence of expenses. *Id.* at 738. We

concluded this was insufficient because gross receipts are insufficient to prove lost profits and there was no evidence of expenses. *Id.* at 740.

¶ 27. In this case the Statzes are not attempting to prove lost profits based on gross receipts without expenses. The records introduced showed the costs of the goods and services sold, as well as the gross income from them, and we are concerned with a relatively small number of lost sales due to the new Pier Pleasure dealers.[5]

¶ 28. As we have noted above, the supreme court has recognized that damages for a breach of a noncompete clause are by their very nature difficult to quantify. *Reiman Assocs.*, 102 Wis. 2d at 323–24. The party who has been determined to have breached such a contract should not be permitted to profit from that difficulty of proof. *Id.* at 325–26. *See also Schubert v. Midwest Broad. Co.*, 1 Wis. 2d 497, 503, 85 N.W.2d 449 (1957). "In such cases, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual

---

[5] The income from D.L. Anderson Co.'s sales from 2001 to 2004 ranged from $1,345,505 to $1,717,332. It is reasonable to infer that the overhead of running the business would not have increased had the lost sales been made, and therefore it was not necessary to introduce evidence of the overhead expenses. *See Schubert v. Midwest Broad. Co.*, 1 Wis. 2d 497, 503–04, 85 N.W.2d 449 (1957) (where overhead or fixed expenses would be the same whether the contract was performed or not, they are irrelevant in determining damages). *See also* 4 L. ALTMAN, CALLMAN, UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES, sec. 23.55 (rev. 4th ed. 2004) (CALLMAN) (The weight of authority holds that fixed overhead expenses need not be deducted from gross income to arrive at the net profits properly recoverable.).

supervisory power of the court." *Reiman Assocs.*, 102 Wis. 2d at 326 (citation omitted). We are satisfied that there was sufficient evidence to permit the jury, to a reasonable degree of certainty, to find that Anderson's breach of the noncompete clause caused the Statzes' damages and to fix $15,000 as the amount of damages.

## C. Extension of Noncompete Clause

¶ 29. The purchase agreement provides that the term of the noncompete clause "shall be tolled for the period commencing on the date any successful action is filed for injunctive relief or damages arising out of a breach . . . of [the noncompete clause] and ending upon final adjudication (including appeals) of such action." Based on the jury's findings of a breach of the noncompete clause and damages, the court extended the noncompete clause by 678 days. The defendants object to this order on the ground that Anderson did not breach the noncompete but raise no other objection. Because we have concluded there was sufficient evidence for the jury to find both a breach of that clause and to award $15,000 in damages, we conclude the court's extension was proper.

## II. Tradename Infringement Claim

¶ 30. The defendants contend there is insufficient evidence to support the jury's finding that they infringed the tradename D.L. Anderson Co., and the circuit court therefore erred in denying the postverdict motion to change the answer to this question from "yes" to "no." They also contend that the damages for this claim were not proved to a reasonable degree of certainty and the circuit court therefore should have changed the award of $75,000 to zero. Finally, they

assert that the court erred in submitting the issue of punitive damages to the jury and in not reducing the jury's award of $180,000 to zero.

## A. Tradename Protectability and Infringement

### 1. Anderson's Right to Use His Own Name

¶ 31. The defendants first argue that, even though Anderson had transferred the tradename D.L. Anderson Co. in the asset purchase agreement, he had the right to continue to use his name in connection with any business except as that agreement expressly prohibited him from doing so. According to the defendants, the only prohibition on Anderson's use of the name was in the noncompete clause. Thus, they assert, he could use his name in connection with any business that did not compete with the pier and lift business. It is their position that Anderson Marine was not in competition with the pier and lift business because it sold boats, not piers and lifts.

¶ 32. There is a significant deficiency in this argument in that it ignores the jury instructions that were given. The jury was instructed:

> Tradenames, or business names, are entitled to protection from infringement/unfair competition to protect the reputation and goodwill of the tradename owner. Ordinarily, a party has a right to do business under his or her own name. The right may, however, be voluntarily limited by contract. When a family name is part of a tradename, the family name may be transferred to a purchaser the same as any other asset of the business.

The instructions also informed the jury that a tradename that had acquired secondary meaning was entitled to protection from infringement. If the jury found that "D.L. Anderson Co." had acquired secondary mean-

493

ing, the jury was instructed that it must then determine whether defendants' use of the tradename "Anderson Marine" created a likelihood of confusion with the tradename "D.L. Anderson Co." The jury was also instructed:

> Plaintiffs and Defendants *do not have to be in direct competition* in order for you to find infringement/unfair competition. Defendants had a duty to choose a name to avoid the likelihood of consumers confusing it with Plaintiffs' tradename.

(Emphasis added.)

¶ 33. Thus, although the jury was instructed that a person could limit the right to do business under his or her name by contract, it was not instructed on whether or to what extent the asset purchase agreement did so.[6] Defendants do not challenge the jury instructions. Such a challenge would include citation to the record showing that they had objected to the jury

---

[6] *Spheeris Sporting Goods, Inc. v. Spheeris on Capitol*, 157 Wis. 2d 298, 308, 459 N.W.2d 581 (Ct. App. 1990), on which the defendants rely, states, consistent with the jury instructions:

> Ordinarily, a party has the right to do business under his or her own name. The right may, however, be voluntarily limited by contract. Conversely, one may transfer to another the right to use his family name. Although not relevant here, it has been held that when a family name is part of a tradename, the family name may be transferred to the purchaser the same as any other asset of the business.

(Citations omitted.)

In *Spheeris* there was no need for the court to address what "limited by contract meant." However, it appears that the general rule is that when a person transfers the right to use his or her personal name as a tradename, any limitation on that person's continued use of his or her personal name must be expressly stated in the transfer agreement. *See* 4 CALLMAN, sec. 20.67.

instructions that were given or to the court's refusal to give instructions they proposed. *See* Wis. Stat. § 805.13(3) (2005–06)[7] (failure to object to a jury instruction the court proposes constitutes a waiver of any error in the proposed instruction). The defendants also do not explain why they are entitled to a reversal of the jury verdict based on a legal theory on which the jury was not instructed.[8]

¶ 34. Instead of challenging the jury instructions, the defendants analyze the evidence in light of what they assert is the correct law. This is a flawed approach. As we have explained in paragraph 9, when a party challenges the sufficiency of the evidence, we consider the evidence in the context of the law as stated in the instructions actually given. *Kovalic*, 161 Wis. 2d at 873 n.7. We conclude the defendants' argument that Anderson had the right to use his name on a noncompeting business does not entitle them to a reversal on the jury's verdict on tradename infringement.

2. Secondary Meaning

¶ 35. The jury was instructed on secondary meaning:

---

[7] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[8] We do not have the common law power to review waived error in jury instructions, although we may exercise our discretionary power of reversal under Wis. Stat. § 752.35 when a waived error regarding a jury instruction results in the real controversy not being tried. *See Gosse v. Navistar Int'l Transp. Corp.*, 2000 WI App 8, ¶ 19 n.6, 232 Wis. 2d 163, 605 N.W.2d 896. The defendants do not contend the real controversy was not tried.

Secondary meaning describes the function of identifying goods or services with a particular or single source. When a tradename has acquired a secondary meaning, the name is entitled to protection from unfair competition based on tradename infringement. Infringement actions, even against a noncompetitor, protect the reputation and goodwill exclusively appropriated to the trademark holder. The key to establishing secondary meaning for a tradename is evidence that the relevant target group mentally identifies the tradename as the single source for the goods or services.[9] The relevant consuming public must recognize the tradename as identifying and distinguishing a Plaintiff's goods and services. Secondary meaning can be established through direct evidence, such as consumer testimony or consumer surveys, or through some circumstantial evidence. Circumstantial evidence includes evidence of exclusivity, length and manner of the tradename's use, the amount and manner of advertising, amount of sales, market share, and number of customers.

(Footnote added.)

---

[9] The use of "the" instead of "a" to modify "single source" is apparently based on *Spheeris*, 157 Wis. 2d at 312, which refers to the "relevant target group mentally identify[ying] the tradename as *the* single source for the product." (Emphasis added.) However, *Spheeris* is citing to *Echo Travel, Inc. v. Travel Assoc., Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989), and that case uses "*a* single source" in explaining that secondary meaning means that "there is 'a mental association in buyers' minds between the alleged mark and a single source of the product." (Citations omitted, emphasis added.) A single source, rather than the single source is correct. Secondary meaning does not require that the relevant target group associate the tradename with the only source of the goods or services, but with a particular source of goods or services. However, the use of "the single source" rather than "a single source" in this instruction does not affect any issue on appeal.

496

¶ 36. We conclude the evidence was sufficient to establish secondary meaning. There was evidence that Anderson had been operating a business selling piers and lifts using the name "D.L. Anderson" since the early 1980s; that name was on the business's vehicles, boats, advertising, business cards and advertising merchandise and appeared in the yellow pages and on a website advertising the business. Anderson estimated that at the time he sold the business he had 300–to-500 "regular customers that live on the lake." He acknowledged that customers identified his name with the business that sold the piers and boats, and that he chose the name Anderson for his new business at The Sailboat House because he knew it would be a familiar name to prospective customers and to former customers. There was also the evidence that the Statzes paid $200,000 for the good will associated with the name "D.L. Anderson Co." It is reasonable to infer from this testimony that the relevant target market of people who lived on lakes in the area around Waunakee and wanted to buy piers and lifts for boats, or needed installation and removal services for piers and lifts they already had, identified the name "D.L. Anderson" as a particular source for the goods and services sold by that business.

### 3. Likelihood of Confusion

¶ 37. The jury was instructed on likelihood of confusion:

> In determining whether there is or was a likelihood of confusion between Plaintiffs' tradename and Defendants' use of "Anderson Marine," you may draw on your common experience as citizens of the community. Likelihood of confusion is also determined by evaluating the following factors:

1. The degree of similarity between names;

2. The similarity of the products and overlap of marketing channels;

3. The area and manner of concurrent use;

4. The degree of care likely to be exercised by consumers;

5. The strength and distinctiveness of Plaintiffs' name;

6. Evidence of actual confusion; and

7. Defendants' intent when selecting the name, "Anderson Marine."

No one factor or consideration is conclusive, but each aspect should be weighed in light of the total evidence presented at trial. However, while actual confusion or deception is not essential to a finding of tradename infringement/unfair competition, such evidence is entitled to substantial weight.

The jury was also instructed:

It is not necessary to constitute an infringement that every word of the tradename be appropriated. It is sufficient that enough be taken to deceive the public. If one word of the tradename is the salient portion, it may be given greater weight than surrounding words.

¶ 38. A jury could reasonably find that "Anderson Marine" and "D.L. Anderson Co." are similar because it could reasonably decide that "Anderson" is the salient portion of each name. While the evidence showed only a small overlap of products, a jury could conclude from other evidence that the customers targeted by each of the businesses were largely the same, as was the

method of marketing. The proximity of the businesses to each other could also be reasonably viewed as contributing to a likelihood of confusion.

¶ 39. There was also evidence of actual confusion. Sue Statz testified about a number of incidents of actual confusion, including a check from an invoiced customer made out and sent to Anderson Marine that was meant for D.L. Anderson Co.; a check sent to D.L. Anderson Co. that was meant for Anderson Marine; and frequent phone calls to D.L. Anderson Co. from people wanting Anderson Marine. Steve Statz and Scott Statz testified to other instances of customers confusing D.L. Anderson Co. with Anderson Marine, and also testified that these instances were representative, not exhaustive.[10]

¶ 40. With respect to the defendants' intent when selecting the name "Anderson Marine," the jury could reasonably infer from Anderson's own testimony that he chose the name to take advantage of the association that customers of D.L. Anderson Co. would make between that business and his new business.

---

[10] There was also evidence of instances of confusion by delivery people and vendors. The defendants argue that this testimony is not relevant because what matters is the likelihood of confusion by customers or potential customers. The wording of portions of the instruction arguably support this view—for example, the instruction that "[d]efendants had a duty to choose a name to avoid a likelihood of *consumers* confusing it with Plaintiff's tradename"—as does the case the Statzes cite, *Madison Reprographics, Inc. v. Cook's Reprographics, Inc.*, 203 Wis. 2d 226, 245 n.10, 552 N.W.2d 440 (Ct. App. 1996) ("The testimony of a friend of a shareholder in [the plaintiff company] who is not a customer or a potential customer is not relevant." (Citations omitted.)). However, it is not necessary to resolve this issue because we conclude there was sufficient evidence for the jury to find a likelihood of confusion without this testimony.

¶ 41. We conclude there was sufficient evidence that Anderson's use of the name "Anderson Marine" in connection with his new business created a likelihood of confusion among the public with the tradename "D.L. Anderson Co." The defendants' argument to the contrary is based on other evidence the jury might have considered or other inferences the jury might have drawn from the evidence. However, that is not the standard. *See Wisconsin Cent. Farms*, 296 Wis. 2d 779, ¶ 17.

B. Compensatory Damages

¶ 42. In addition to the general instructions on damages quoted in paragraph 19 above, the jury was instructed as follows regarding tradename infringement damages:

> If you determine the defendants are liable to the plaintiffs for infringing plaintiffs' tradename/competing unfairly with the plaintiffs, then you may determine what sum of money will right the wrong done to the plaintiffs by the defendants.

> In determining damages, you may consider whether the plaintiffs suffered any measurable loss to its goodwill. The goodwill of a company is an intangible business value that reflects the basic human tendency to do business with merchants who offer products and services of the type and quality the customer desires and expects. Service to the customer, and a willingness to stand behind a warranty and other representations about the quality of the products or services sold by a merchant, are factors that help establish the goodwill of a business.

> If you find that the plaintiffs' goodwill has been damaged either by injury to its general business repu-

tation or by damage to a particular product or service, you may assess such damages as you may find to be shown by the evidence . . . .

██

¶ 43. We agree with the defendants that there is no evidence that the good will or reputation of D.L. Anderson Co. was damaged by the defendants' use of the name Anderson Marine. There was no testimony that the instances of actual confusion resulted in customers having a negative view of the company or its products and services. Certainly the misdirection of phone calls, mail, and deliveries[11] *to* D.L. Anderson Co. cannot reasonably be viewed as affecting the good will associated with that tradename, and we also see no basis for reasonably inferring damage to that good will from instances of misdirection of phone calls, mail, and deliveries to Anderson Marine instead of to D.L. Anderson Co. We note that the Statzes are not contending that they lost any sales because of these instances of confusion and the record does not support such a finding.

¶ 44. The Statzes contend that, because a monetary value for the good will is established by the $200,000 allocated to it in the asset purchase agreement, there is sufficient evidence for the jury to determine that the good will was damaged and to determine a damage amount. But this argument fails to explain the evidentiary basis for inferring a diminution in that value.

¶ 45. The Statzes point to the use of the word "may" in the instruction on goodwill and argue that the jury did not have to determine damages for infringement based on damage to goodwill, but rather that

---

[11] *See* footnote 10.

damage to goodwill was simply one option. Even if that is a correct reading of the instruction—and it appears that it is—there must then be evidence of some other damage resulting from the infringement; but the Statzes do not explain what that is. They refer to cases showing that there are a number of different theories of damages for trademark infringement and unfair competition claims besides a plaintiff's lost profits, such as the defendant's profits, citing *Blue Ribbon Feed Co., Inc. v. Farmers Union Cent. Exch., Inc.*, 731 F.2d 415, 421 (7th Cir. 1984), and the fair market value of the property that has been taken, citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992) (damages based on a reasonable royalty for use of the trademark might be an appropriate measure of damages). We do not disagree that these are among a number of alternative methods for determining compensatory damages for tradename or trademark infringement. However, the Statzes refer us to no evidence of the profits of Anderson Marine or a theory that would make this a reasonable basis for damages in this case;[12] nor do they refer us to any evidence of the value of the use that the defendants made of their tradename.

¶ 46. The Statzes cite *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976), for the proposition that "proof of the amount of economic harm is not required in order to establish a claim for damages" and "actual monetary injury need not be shown in order to recover damages." However,

---

[12] We also observe that the court in *Blue Ribbon Feed Co., Inc. v. Farmers Union Cent. Exch., Inc.*, 731 F.2d 415, 421 (7th Cir. 1984), states that in order for the defendant's profits to be an appropriate basis for damages, the parties must be in competition. The Statzes do not argue that Anderson Marine was in competition with D.L. Anderson Co.

this is a misreading of that case. The court there was reviewing a directed verdict against the plaintiff based on the lower court's determination that there was no *infringement;* and in that context the court stated that the lower court erred in assuming that there had to be economic harm to the plaintiff in order to establish *infringement. Id.* at 274–76. As the court explained, infringement requires that the plaintiff establish a likelihood of confusion, but not economic harm. *Id.* at 276. The court did not suggest that *damages* for the infringement could be recovered without proof of economic injury; that issue was not before the court. Indeed, the cases the *Beefeater* court cites make clear that the court was not considering what proof was necessary for damages. *See Safeway Stores, Inc. v. Rudner,* 246 F.2d 826, 829 (9th Cir. 1957) (it is "immaterial . . . [that] appellant suffered no actual loss or damage as a result of the appellee's use of the tradename . . . for this was not an action for damages"); *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 927 (8th Cir. 1967) (in the context of holding that plaintiff is entitled to injunctive relief, stating that plaintiff need not show actual or monetary injury).

■

¶ 47. While a plaintiff who has proven tradename infringement need not prove monetary or economic injury in order to obtain injunctive relief, a plaintiff seeking monetary relief for an infringement must prove damages. 4 CALLMAN, sec. 23:55–56. Here, the jury was correctly instructed that the Statzes had "the burden of proving by the greater weight of the credible evidence, . . . to a reasonable certainty" that they "sustained damages . . . and the amount of damages." Applying this standard, we conclude there was insufficient evidence from which a jury could find that the Statzes

sustained damages as a result of the defendants' infringement of their tradename.

C. Punitive Damages

¶ 48. We agree with the defendants that, because there is insufficient evidence to award any compensatory damages, the plaintiffs are not entitled to punitive damages. *Tucker v. Marcus*, 142 Wis. 2d 425, 438–39, 418 N.W.2d 818 (1988) (punitive damages may not be awarded in the absence of an award for actual damages).

III. Injunctive Relief

¶ 49. The defendants contend that, even if we conclude there was sufficient evidence for the jury to find breach of the noncompete clause and tradename infringement, the injunctive relief ordered by the court is overbroad in several respects. With one minor exception, we conclude the injunction is not overbroad.

¶ 50. Injunctive relief is proper when the movant has no adequate remedy at law and the movant will suffer irreparable harm if an injunction is not granted. *Sunnyside Feed Co., Inc. v. City of Portage*, 222 Wis. 2d 461, 472, 588 N.W.2d 278 (Ct. App. 1998). The purpose of an injunction is to prevent future violations. *Pure Milk Prods. Co-op v. National Farmers Org.*, 90 Wis. 2d 781, 800, 280 N.W.2d 691 (1979).

¶ 51. The decision to issue an injunction and the terms of an injunction are committed to the discretion of the circuit court. *City of Wisconsin Dells v. Dells*

*Fireworks, Inc.*, 197 Wis. 2d 1, 15, 539 N.W.2d 916 (Ct. App. 1995). We affirm the decision of the circuit court if the court applied the correct law to the facts of record and used a rational process to reach a reasonable result. *See id.*

¶ 52. Because the special verdict in this case did not ask specific questions about the conduct that constituted a breach of the noncompete clause and infringement of the tradename, the circuit court in essence acted as fact-finder in determining the facts for purposes of the injunctive relief. The court discussed the evidence and explained its reasoning in granting the injunction. We assume the court made the findings the record reasonably permits that are necessary to support its conclusions. *See Town of Avon v. Oliver*, 2002 WI App 97, ¶ 23, 253 Wis. 2d 647, 644 N.W.2d 260.

¶ 53. With respect to the noncompete clause, the purchase agreement specifically provided that Anderson

> [a]cknowledge[s] that a breach of this Agreement would cause irreparable damage to [the Statzes], and in the event of an actual or threatened breach of the provisions of this Agreement, [they] shall be entitled to a temporary restraining order and an injunction restraining . . . Anderson from breaching such covenants without the necessity of posting bond or proving irreparable harm, such being conclusively admitted by . . . Anderson.

In addition, the agreement provided that it "shall be given the broadest, lawful and enforceable scope permissible for protection of the parties. In the event of any breach of this Agreement by a party, the non-breaching party shall be entitled to injunctive relief prohibiting future activities that violate this Agreement."

¶ 54. There is no question, then, that the Statzes are entitled to an injunction to prevent future violations of the noncompete clause and that the circuit court could properly take a broad view of what was necessary to protect their rights under that clause.

¶ 55. The only objection of the defendants to the scope of the injunction that we conclude has merit is directed at paragraph 5. This enjoins both defendants from

> offering for sale any goods and serves in the Pier and Lift Business to the extent such goods and services were being sold or offered for sale by the D.L. Anderson Co. at the time the business was sold to the Plaintiffs . . . until expiration of the restrictive covenants imposed on Donald Anderson, as extended by the Court.

The defendants contend this is overbroad because it contains no geographic restriction, whereas the noncompete clause applies only within a 120–mile radius of Waunakee. We agree. The Statzes respond that this paragraph "merely reiterates the language of the agreement . . . ." We understand this as an acknowledgement that paragraph 5 ought to be no broader geographically than the noncompete clause, and we understand the circuit court's comments to intend this. We will therefore order this modification on remand.

¶ 56. The defendants have another objection to paragraph 5 that we reject. They point out that only Anderson, not Anderson Marine, is bound by the noncompete clause and therefore Anderson Marine should not be enjoined. However, Anderson testified he was the sole owner of Anderson Marine. The court could rea-

sonably conclude that it was necessary to enjoin Anderson's company as well as Anderson.

¶ 57. The defendants object to paragraph 6, which enjoins Anderson from "performing any work for Pier Pleasure within one-hundred and twenty (120) miles of Waunakee, Wisconsin on a paid or unpaid basis . . .," on the ground that Anderson may work for Pier Pleasure as long as his employment is not in competition with the pier and lift business as engaged in by D.L. Anderson Co. However, they do not explain what work Anderson might perform for Pier Pleasure within the geographic area that would not violate the noncompete clause.

¶ 58. The court's comments indicate that it viewed Anderson as having taken an unreasonably narrow view of his obligations under this clause and that it was concerned he would continue to do so. This view is supported by the evidence. The court could reasonably infer from the evidence that Anderson was not concerned with whether the Statzes received the benefit of their bargain regarding the noncompete clause, but instead was concerned with how closely he could remain associated with the pier and lift business without incurring liability. The court could therefore reasonably decide that an injunction directed against only the specific position Anderson held with Pier Pleasure would not sufficiently protect the Statzes, and further decide that general wording that Anderson could not work for Pier Pleasure in a manner that violated the noncompete clause would be interpreted by him in an unreasonably narrow way. In the absence of any indication that there was work for Pier Pleasure that Anderson might do that would not violate the noncompete clause (within the prescribed geographic

507

territory), the court could reasonably conclude that an injunction against "any work" was necessary to avoid future violations.

¶ 59. The defendants object to paragraphs 7 and 8, which enjoin Anderson from "manufacturing, marketing, or offering for hire, within one-hundred and twenty (120) miles of Waunakee, Wisconsin, his lift boat or brush cutter in any project along waterways or shorelines" and "any other equipment intended to be used in the Pier and Lift Business." They contend that the evidence concerning Anderson's use of his brush cutter and lift boat was insufficient to establish violations of the noncompete clause. They also contend the noncompete clause does not restrict Anderson from manufacturing and selling equipment intended to be used in the pier and lift business.

¶ 60. The evidence regarding the lift boat was that Anderson designed it and paid $28,000 to have it built. It was intended to make installing and removing lifts easier. He applied for a patent on it but let the application expire. While Anderson was still in the process of testing the boat, he used it on his own property[13] with Dean Tydrich. Tydrich was a former employee of the Statzes' D.L. Anderson Co. and had started his own pier and lift business. Anderson testified that he simply asked Tydrich to help him as a friend. Tydrich testified that Anderson showed him how the lift boat worked and that he (Tydrich) said he would be interested in using one in his business when development of the product was successfully completed. A reasonable fact-finder could conclude from the

---

[13] The asset purchase agreement permitted Anderson to install piers and lifts on his own property.

amount of money Anderson invested in the boat and from the patent application that Anderson intended the boat for business use, not simply personal use, and that he was showing it to Tydrich because he knew Tydrich might be interested in purchasing one for his business. Whether or not there is sufficient evidence to reasonably decide that Anderson's conduct with respect to the lift boat had gone far enough to constitute a violation of the noncompete clause, the reasoning we have discussed in paragraph 58 supports including the lift boat in the injunction. The court could reasonably decide that, unless Anderson were enjoined, he would continue to attempt to interest competitors of D.L. Anderson Co. in purchasing one of his lift boats, and further reasonably decide that conduct would constitute a violation.

¶ 61. The evidence concerning the brush cutter was that a photograph of Anderson using a brush cutter appeared in the Middleton newspaper over the caption: " . . . Don Anderson of Anderson Marine LLC of Waunakee demonstrated his rubber tracked brush cutter around the confluence pond near Deming Way." The confluence pond was near a shoreline area. The defendants contend that this was just a demonstration and that cutting brush around a pond is not shoreline restoration or landscaping. However, a reasonable factfinder could conclude from the fact that Anderson chose to publicize his work with the brush cutter as connected to Anderson Marine, that he had the purpose of getting business for Anderson Marine, and could also conclude that brush cutting around a pond near the shoreline was sufficiently close to the shoreline so as to constitute shoreline restoration or landscaping. Even if the evidence did not show that Anderson was already engaged in the business of shoreline restoration and landscaping, for the reasons we have discussed in paragraph 58,

the court could reasonably conclude that, unless he was enjoined, he would attempt to develop a business that would compete with the pier and lift business as carried on by D.L. Anderson Co.

¶ 62. The reasonable inferences that a fact-finder could draw against Anderson regarding the lift boat and brush cutter support the provision in paragraph 8 regarding "other equipment intended to be used in the pier and lift business." The court could reasonably decide that an injunction limited to the lift boat and brush cutter was not adequate to protect the Statzes because Anderson had demonstrated that he was likely to take the narrowest view possible of any injunction.

¶ 63. The defendants contend that paragraph 9, which relates to providing advice to Tydrich and other competitors of D.L. Anderson Co., is overbroad because it "proscribes . . . activities that do not involve purported violations of the covenant." They do not explain what those activities are. We decline to address this insufficiently developed argument.

¶ 64. We now turn to the defendants' objections to the provisions of the injunction that relate to the tradename infringement. They contend the Statzes are not entitled to equitable relief on this claim because they have not proved "some injury or actual or probable deception or confusion, on the part of the plaintiff's customers." However, for purposes of injunctive relief, injury is presumed from a likelihood of confusion. *Beefeater*, 540 F.2d at 276. The defendants do not present a developed argument to explain why the circuit court erroneously exercised its discretion in granting injunctive relief based on the jury's finding of infringement, which we have upheld.

IV. Attorney Fees

██

¶ 65. The purchase agreement provides that "[i]n any action concerning this Agreement, the party obtaining the monetary judgment, after all offsets, shall also be entitled to recover reasonable attorney fees and costs." The defendants object to the court's award of attorney fees on the tradename claim because, they assert, it is not an "action concerning this Agreement." We conclude the Statzes are not entitled to attorney fees for the tradename claim, but for a different reason.

██

¶ 66. A party is not entitled to attorney fees based on a contractual provision unless the language clearly and unambiguously so provides. *Hunzinger Const. Co. v. Granite Res. Corp.*, 196 Wis. 2d 327, 340, 538 N.W.2d 804 (Ct. App. 1995). The language of the contract here provides for attorney fees for the party "obtaining the monetary judgment." We have concluded that the Statzes are not entitled to a monetary judgment on the tradename claim. Therefore the contract does not clearly and unambiguously provide for the recovery of attorney fees on the tradename claim.

## CONCLUSION

¶ 67. We affirm the jury's verdict that Anderson breached the noncompete clause, the jury's award of $15,000 in damages on that claim, and the court's order extending the term of the noncompete. We affirm the jury's verdict of tradename infringement, but reverse its award of compensatory and punitive damages and direct the court on remand to enter zero for compensatory damages and zero for punitive damages. We affirm

the terms of the injunction entered by the court except that the first sentence of paragraph 5 shall be modified on remand to include the geographic limitation, "within one hundred and twenty (120) miles of Waunakee, Wisconsin" after the phrase "offering for sale . . . ." Finally, we reverse the court's award of attorney fees insofar as it includes fees for work that is not related to the breach of contract claim; on remand the court shall reduce the award accordingly.

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded with directions.